IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:19-CR-021-Y |
| TANYA MARIE REGAN (1)<br>CHRISTOPHER JAMES REGAN (2) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT CHRISTOPHER JAMES REGAN'S SECOND MOTION TO SUPPRESS EVIDENCE

Defendant Christopher James Regan was concerned about a number of incriminating items located in a mobile home trailer that his mother, Stephany Wilkins, allowed him to use. He wanted them removed from the trailer and destroyed and, because he was detained while awaiting arraignment on the charges in this action, he would need someone to do it for him. He asked his mother to do it.

Wilkins, in turn, contacted the United States Department of Homeland Security (HSI) and asked agents to assist her in removing the items. Upon Wilkins's request and written consent, HSI agents removed electronic equipment and memory cards from the trailer. In addition, Wilkins gave them items that Regan left in her truck.

The Government thereafter obtained a warrant authorizing forensic examination of the items. Regan's fear that the items were incriminating were well-founded. He now asks the court to suppress all evidence obtained as a result of his mother's collaboration with HSI. *See* Mot. at ECF No. 72. The United States respectfully asks the Court to deny Regan's motion in its entirety.

I.   Factual Background

It was on March 1, 2019, that Wilkins contacted HSI Special Agent Marisol O'Leary for help in removing the incriminating items from the trailer. Prior to that day, Wilkins had several telephone conversations with her son who called her from the Mansfield Jail. Those conversations, which concerned items in the trailer, were recorded.

A.   Wilkins Expressed Concern Regarding Items in the Trailer

During a telephone conversation on February 22, 2019, Wilkins told Regan she was concerned that law enforcement officers might seize property from the trailer. She told him that her husband removed a gun from the trailer and asked Regan whether she should remove anything else. She appeared concerned about her property in the trailer, and the two agreed that, with the exception of Regan's clothing, everything in the trailer—including the television and sofa, as well as dishes—belonged to her. Regan told his mother that 99 percent of what he owned was in a storage unit. Wilkins nonetheless asked him again whether she should remove things from the trailer. Regan responded, "There's nothing in that house. Nothing."[1] Two days later, Regan changed his mind.

B.   Regan Asked Wilkins to Remove Incriminating Items From the Trailer

On February 24, 2019, Regan told his mother, "I just remembered something . . . in my top dresser drawer there are some cards that Tanya had given me . . . and I don't know what's on um . . . ." He explained to his mother that the "cards" were the type that

---

[1] Wilkins also told her son about her visits to the trailer. On February 21, 2019, she told Regan she was under a great deal of stress, found tequila in his trailer, and drank it. Regan laughed and reassured her. During a telephone conversation on February 22, 2019, Wilkins told Regan that she went to his trailer again and drank more tequila.

**Christopher James Regan**
**Government's Response to Second Motion to Suppress – 2**

are used in cameras and told her she would find them in his sock drawer. He said, "I don't know what's on them, um, it might be a good idea if those like got burned or went away because she may be trying to set me up for something . . . I just thought about that." He also asked his mother to remove a video camera from a closet.

Later in the conversation, Regan reiterated that he wanted Wilkins to destroy the cards. He said, "You might want to just burn those because, again, she gave them to me and I don't know why . . . I didn't think about it until just now . . . I was like, 'hold on a minute, she gave me this crap and I wonder why now.'" He said he was suspicious.

### C. Wilkins Solicited HSI's Help in Removing the Incriminating Items

Six days later, Wilkins contacted HSI Special Agent O'Leary. HSI Special Agents Brian Noack and Burton Reavis responded to Wilkins's home at 120 Private Road 5503 in Point, Texas. The agents interviewed Wilkins and learned that she had owned two trailers for 45 years and both were situated on adjoining Lots #120 and #124 on Private Road 5503. Wilkins and her spouse resided in the trailer on Lot #120. The trailer on Lot #124 had been empty until a few months prior when she allowed her son to use it. She told the agents Regan asked her if he could stay in the trailer and fix it up. According to Wilkins, Regan believed that having a place to stay would help him in the process of reclaiming his children from Child Protective Services.

Wilkins told the agents that Regan did not pay rent and that she maintained custody of the trailer and paid the property and utility bills. She also said Regan moved some things into the trailer, but she could not recall a single instance of him staying overnight there. She believed he stayed overnight with his wife at her mother's

**Christopher James Regan**
**Government's Response to Second Motion to Suppress – 3**

residence, which is also located in Point, Texas.

Wilkins told the agents that her son asked her to remove memory cards and a video camera from the trailer. She said she found the items but believed they contained child pornography and therefore returned the items to the places she found them. She said she feared there might be more of such material at "her residence" and wanted it searched and all such material removed.

### D. The Agents Searched the Trailer and Removed the Incriminating Items

Wilkins signed a consent form authorizing Agents Noack and Reavis to search the trailer. She escorted them from her home to adjoining Lot #124, unlocked the door with a key, and watched the agents search the trailer.

The agents found six memory cards in the top drawer of a dresser and a Sony 8mm video camera and 8mm videotapes in a black bag on the top shelf of a closet. The agents discovered and seized other items, too, including a Night Owl infared home security camera, a Cannon Powershot SX130 camera, and a Wal-Mart receipt.

Before the agents left, Wilkins gave them a backpack that contained an LG cellphone, a memory card, and miscellaneous documents, including a receipt made to Regan for rental of a storage building. Wilkins told the agents the backpack belonged to Regan and that he left the items in her truck on the day he was arrested. She wanted the agents to take the items and examine them. The Government thereafter acquired a search warrant to search the contents of the items.

II.   Arguments and Authorities

The Court should not suppress evidence the Government acquired from the trailer and from Wilkins on March 1, 2019. The Government searched the trailer pursuant to valid consent from Wilkins who had actual and apparent authority to authorize the search. In regard to the backpack and other evidence Wilkins handed to the agents, Regan left the items in the truck months prior to March 1, 2019, and therefore abandoned any property interest in them.

A.   The search of the trailer was valid

1.   Legal Standard

Valid consent to a search is a well-established exception to Fourth Amendment protections that require law enforcement officers to present a warrant supported by probable cause before conducting a search. *United States v. Shelton*, 337 F.3d 529, 532 (5th Cir. 2003). And valid consent may come from a third party who has "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 170 (1974). Two types of common authority will support a third-party's consent: actual authority and apparent authority. *United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir. 1997). Actual authority is found when the facts show the third party had joint access to or control over the property for most purposes. *Id*. Apparent authority is found when the third party did not have actual authority to consent to a search, but the facts were such that the officers reasonably believed the third party did. *Id*.

2. <u>Wilkins Had Actual Authority to Consent to the Search</u>

A finding of common authority is based on facts showing "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that [one of the parties] has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the . . . search[ ]." *Matlock*, 415 U.S. at 171 n.7.  Assumption of risk is a critical inquiry and it is fact-intensive; and the focus is not upon the third party but, rather, on the defendant and whether the defendant relinquished an expectation of privacy in the property.  *Shelton*, 337 F.3d at 535, 538.  The essential question is whether the defendant granted the third party a level of access and control over the property that resulted in a loss in expectation of privacy and a risk that the third party might expose his interest to others.  *Id*. at 535−36.

The facts in this case are similar to those in *United States v. Shelton*, a case in which the defendant's wife cooperated with law enforcement to expose the defendant's crimes.  *Id*. at 530.  The defendant's wife moved from the marital residence after learning of an extra-marital affair; however, the defendant, who remained in the home, allowed his wife to keep her personal belongings, including furniture, in the residence; allowed her to come and go at will from the residence; and allowed her to access the home with a key and personal security code.  *Id*. at 530−32.  In short, the defendant never restricted his wife's access to the home.  *Id*.  In addition, he repeatedly solicited her participation in his crimes and took no steps to conceal incriminating items located in the home.  *Id*. at 532.

Based on these facts, the court concluded that even though the wife did not live in

the residence, she nonetheless maintained common authority to consent to a search of the home.[2] *Id*. at 533. The court noted the defendant's conduct and, in particular, the fact that he never attempted to restrict his wife's access to the residence in any way. *Id*. at 537. The defendant never changed the locks and did not revoke his wife's security access code; he was aware that she entered at will and he did nothing to restrict the frequency or times that she did so; he never changed the location of the incriminating evidence; and he never stopped soliciting her participation in his criminal activity. *Id*.

As in *Shelton*, the defendant in this case solicited the help of a family member, whether she knew it or not, to participate in criminal activity; that is, he asked his mother to obstruct justice by destroying incriminating evidence. Likewise, as the defendant in *Shelton*, Regan knew his mother accessed the trailer at will but took no steps to restrict her access in any way. As the defendant in *Shelton*, he did not ask his mother to remove her furniture, he did not change the locks, and he never objected to his mother entering the trailer or allowing others, including her husband, to enter it. In addition, Regan, like the defendant in *Shelton*, made no attempt to hide incriminating evidence in the trailer. Regan had no expectation of privacy in the trailer.

As in *Shelton*, Regan's decision to forgo an expectation of privacy requires a conclusion that he assumed the risk that Wilkins would expose his privacy interest to others. And that is what she did.

---

[2] It should be noted that the third party in *Shelton* removed items from the home and gave them to government agents. However, the court equated her behavior with a search: "Although the [wife] did not literally usher government agents into the house so that they could conduct their own search, [she] effectively allowed them to search the premises by acting as their agent . . . ." *Id*. at 533.

### 3. Wilkins Had Apparent Authority to Consent to the Search

Because the facts conclusively show that Wilkins had actual authority over the trailer to consent to the search on March 1, 2019, the Court need not determine whether she had apparent authority to do so. *See id*. at 538 (declining to reach determination as to apparent authority after finding third party had actual authority). But, even if the court were to engage in that inquiry, the facts in this case support a finding of apparent authority. Apparent authority exists when the facts available to the agents at the time of the search would objectively lead any agent to believe the third party had authority over the premises sufficient to consent to the search. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (describing the standard as objective in nature).

The facts available to the agents on March 1, 2019, objectively led to a reasonable belief that Wilkins had common authority over the trailer to consent to its search. Wilkins told the agents that her son never stayed overnight in the trailer. She told them she had owned it for 42 years and referred to it as her "residence," and she reported that she maintained custody of the trailer and paid all bills associated with it. She told the agents her son asked her to remove the cards and camera from the trailer, and then she took the agents to the trailer and opened it with a key. It was objectively reasonable for the agents to believe Wilkins had common authority to consent to the search of the trailer.

### B. The seizure of the items in the truck was valid

"[I]t is settled law that one has no standing to complain of a search or seizure of property he has voluntarily abandoned." *United States v. Colbert*, 474 F.2d 174, 176 (5th

Cir. 1973). Regan abandoned the backpack and other items in his mother's truck in January 2019, and had not taken any steps to reclaim the items before March 1, 2019, the day his mother gave them to the agents. In addition and in the alternative, the doctrines of actual and apparent authority are applicable to objects. *Frazier v. Cupp*, 394 U.S. 731, 740 (1969). There is no evidence that Regan took any steps to attempt to secret the items from his mother or restrict his mother's access to them. To the contrary, he allowed her to exert control over them for months without seeking to limit that control.

    C.  <u>Regan Has no Grounds to Object and his Arguments Lack Merit</u>

First, it is no defense that Regan may have expected his mother to keep secret the incriminating evidence: "'It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities.'" *Id*. at 537 (quoting *United States v. Jacobsen*, 466 U.S. 109, 117 (1984)). The Fourth Amendment does not protect such a misplaced belief. *Id*.

Second, Regan's contention that his mother did not have common authority over the trailer because she did not physically reside there is not grounded in law, as demonstrated by the holding in *Shelton*. A third party's habitation in the residence is not an element of common authority, actual or apparent. In addition, Regan's reliance on *Illinois v. Rodriguez* is misplaced. Again, determinations of authority to consent are fact-intensive. The third party in *Rodriguez* had lived in the residence for a only a short period of time, was not a party to the lease of the residence, did not pay rent, and was not allowed to be there when the defendant was away or invite others into the home. 496 U.S. at 180. She had a key to the apartment but "might have taken it without the

defendant's knowledge." *Shelton*, 337 F.3d at 533.  The defendant in *Rodriguez* simply did not permit the third party unfettered access to the residence and took no actions that indicate he relinquished his expectation of privacy in the residence.  The exact opposite occurred in this case.

III.   Conclusion

Regan permitted Wilkins to exercise common authority over the trailer and thereby relinquished any expectation of privacy he might have had in the trailer, as well as the items he left in her truck; he assumed the risk that Wilkins would expose his privacy interests to others.  His request for suppression of evidence the Government obtained pursuant to Wilkins's valid consent should be denied.

        Respectfully submitted,

        ERIN NEALY COX
        UNITED STATES ATTORNEY

        s/*Ann Howey*
        ANN HOWEY
        Assistant United States Attorney
        Texas State Bar No. 24032312
        1205 Texas Avenue, Suite 700
        Lubbock, Texas 79401
        Telephone:   806-472-7560
        Facsimile:   806-472-7394
        E-mail:   ann.howey@usdoj.gov

CERTIFICATE OF SERVICE

On August 12, 2019, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the court's electronic case filing system. I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Rule 49 of the Federal Rules of Criminal Procedure.

        s/ Ann Howey
        ANN HOWEY
        Assistant United States Attorney