1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2                  FORT WORTH DIVISION

3   UNITED STATES OF AMERICA      .  CRIMINAL ACTION NO.
                                  .  1:19-CR-021-P-BU-2
4   V.                            .
                                  .  Fort Worth, Texas
5   CHRISTOPHER JAMES REGAN       .  October 4, 2019
    . . . . . . . . . . . . . . . .

6

7

8              TRANSCRIPT OF PROCEEDINGS
              (Hearing on Motion to Suppress)
9         BEFORE THE HONORABLE TERRY R. MEANS
              UNITED STATES DISTRICT JUDGE

10

11

12

13  APPEARANCES:

14  For the Government:        MR. RUSSELL H. LORFING
                              MS. ANN HOWEY
15                            United States Attorney's Office
                              1205 Texas Avenue, Suite 700
16                            Lubbock, Texas  79401
                              (806) 472-7351
17
    For the Defendant:        MR. JACOB A. BLIZZARD
18                            MR. DAX PUESCHEL
                              Blizzard & Zimmerman PLLC
19                            441 Butternut Street
                              Abilene, Texas  79602
20                            (325) 676-1000

21  Court Reporter:           MS. ANA P. WARREN
                              U.S. District Court Reporter
22                            501 W. 10th Street, Room 502
                              Fort Worth, Texas  76102-3637
23                            (682) 465-1032

24

    Proceedings recorded by mechanical stenography; transcript
25  produced by computer-aided transcription.

U.S. DISTRICT COURT

2

### P R O C E E D I N G S

 1

 2          (Commencing, 10:00 a.m.)

 3              THE COURT:  All right.  Calling for a suppression

 4      hearing in Case Number 1:19-CR-021-Y, United States of America

 5      versus Christopher James Regan.

 6          Do you say Regan or Regan?

 7              MR. BLIZZARD:  Regan, Your Honor.

 8              THE COURT:  Regan.  All right.

 9          Are the parties ready to proceed?

10              MR. LORFING:  Yes, Your Honor.  Good morning.

11      Russell Lorfing on behalf of the United States, present with

12      co-counsel, Ann Howey.  The government is ready to proceed.

13              THE COURT:  Thank you.

14              MR. BLIZZARD:  Jacob Blizzard for Mr. Regan, and I

15      also have Dax Pueschel here with me, Your Honor.

16              THE COURT:  All right.  Thank you.

17          So it's Jake and Dak (sic)?

18              MR. BLIZZARD:  It's Jacob, Your Honor.

19              THE COURT:  Oh, Jacob.

20              MR. BLIZZARD:  Yes, sir, and Dax.

21              THE COURT:  And, now, I'll take the last name?

22              MR. BLIZZARD:  Blizzard, just like a storm.

23              THE COURT:  Blizzard.

24              MR. BLIZZARD:  Yes, sir.

25              THE COURT:  Okay.  We don't see much of those

1      anymore, do we?

2              MR. BLIZZARD:  Not around here.

3              THE COURT:  And Dak (sic)?

4              MR. PUESCHEL:  Your Honor, Dax Pueschel.

5              THE COURT:  Dax.

6              MR. PUESCHEL:  P, as in Paul, U-E-S-C-H-E-L.

7              THE COURT:  Okay.  Thank you.

8         All right.  We're here to determine whether certain items

9      that were seized -- I don't exactly have the date, but I know

10     you do -- by the government were seized properly under the

11     Fourth Amendment, and we'll proceed.  The government has the

12     burden and may proceed.

13        And if you want to have a brief opening, you may do so.

14     If you don't and you want start directly with testimony, you

15     may do that.

16             MS. HOWEY:  Your Honor, will we have an opportunity

17     for closing?

18             THE COURT:  Sure, a very brief closing.

19             MS. HOWEY:  As you said, we are here to determine

20     whether a consent search was reasonable under the Fourth

21     Amendment, and we will call our first witness.  It's Agent

22     Brian Noack.

23             THE COURT:  All right.  Agent Noack, if you will

24     please step forward, we'll administer the oath when you get

25     here.

4

1          Good morning, sir.

2               THE WITNESS:  Good morning.

3               THE COURT:  Please raise your right hand and be

4     sworn.

5          (Witness sworn by the Court)

6               THE COURT:  Please be seated, sir.

7            BRIAN NOACK, testified under oath as follows:

8                          **DIRECT EXAMINATION**

9     BY MS. HOWEY:

10    Q.  Good morning.

11    A.  Good morning.

12    Q.  Please state and spell your name for the record?

13    A.  My name is Brian Noack, N-O-A-C-K.

14    Q.  And how are you employed?

15    A.  I work for the United States Department of Homeland

16    Security as a special agent.

17    Q.  And where is your current assignment?

18    A.  Resident agent, Tyler, Texas.

19    Q.  And what is your current assignment?

20    A.  I enforce the law, U.S. Customs and Immigration laws, to

21    include anything that comes across the border, money, guns,

22    drugs, also to include child exploitation.

23    Q.  Now, are you an agent, a special agent?

24    A.  I'm a special agent, yes, ma'am.

25    Q.  Were you involved in the search of the property that

5

1    brings us here today?

2    A.  Yes, ma'am.

3    Q.  For the record, when and where did that search occur?

4    A.  The search occurred on March 1, 2019 at the property owned

5    by Ms. Stephany Wilkins.

6    Q.  Would that be 124 Private Road, 5503?

7    A.  Yes, ma'am.

8    Q.  Can you tell the Court how you became involved with that

9    search?

10   A.  I was contacted by Special Agent Marisol O'Leary, who was

11   the case agent for this case out of San Angelo, Texas.  She

12   contacted me by telephone saying that there was possible

13   evidence at the Wilkins house that she wanted to be

14   retrieved.

15          THE COURT:  She wanted what, sir?

16          THE WITNESS:  To be retrieved, the evidence

17   retrieved.

18   BY MS. HOWEY:

19   Q.  Just in case I missed it, is Agent O'Leary stationed in

20   Big Spring, Texas?

21   A.  San Angelo.

22   Q.  Is she the case agent on this case?

23   A.  Yes, ma'am.

24   Q.  Why would she call you and ask you to conduct the

25   search?

6

1   A.  As customary, if there is like an interview or an action

2   that needs to be taken for a case that resides outside of a

3   normal area of responsibility, it's customary to reach out to

4   an agent in that area to go carry out their mission.

5   Q.  Was it your understanding that you were going to search

6   property owned by Stephany Wilkins?

7   A.  Yes, ma'am.

8   Q.  Who do you understand Stephany Wilkins to be?

9   A.  Chris Regan's mother.

10  Q.  The defendant's mother?

11  A.  Yes, ma'am.

12  Q.  Prior to the search on March 1, 2019, what was your

13  involvement in this case?

14  A.  I arrested Chris Regan and his wife, Tanya.

15  Q.  And based on that early involvement, did you have an

16  understanding of the charges in this case?

17  A.  Yes, ma'am.

18  Q.  And what was that understanding?

19  A.  Possession and production of child pornography.

20  Q.  I want to talk to you about some of the events that led up

21  to the search on March 1.

22      Are you aware that Christopher Regan has spoken with this

23  mother, Stephany, or had spoken with her, many times between

24  the date of his arrest and the date of the search.

25  A.  I am.

7

1   Q.  Where was he when those conversations occurred?

2   A.  He was in custody.

3   Q.  He was in jail?

4   A.  Yes, ma'am.

5   Q.  In the course of your investigations, do you listen to

6   what is referred to as jail calls?

7   A.  I do.

8   Q.  And why do you do that?

9   A.  To gather evidence of anything that might be said between

10  the person incarcerated and whoever they are calling.

11  Q.  How often do you listen to jail calls?

12  A.  As often as the case demands, just whenever,

13  spontaneous.

14  Q.  Do they normally proceed in a similar course?

15  A.  Yes, ma'am.  You can identify a jail call.  There is a

16  prerecording on every jail call saying, this is a call coming

17  from the jail.  You're speaking with an inmate and all calls

18  can be recorded.

19  Q.  If you will find Exhibits 3, 6 and 8 in the exhibit

20  notebook at the stand?

21  A.  Yes, ma'am.

22  Q.  Are Exhibits 3, 6 and 8 audio recordings of some of the

23  jail calls that occurred and conversations that occurred

24  between Stephany Wilkins and her son, the defendant?

25  A.  Correct.

8

1    Q.  Have you had a chance to listen to these recordings, the

2    recordings in Exhibits 6, 3 and 8?

3    A.  Yes, ma'am.

4    Q.  Do they appear to be true and correct recordings of the

5    telephone conversations between Ms. Wilkins and the defendant?

6    A.  Yes, ma'am.

7    Q.  Do they appear to have been altered in any way?

8    A.  Not that I can tell.

9    Q.  Do you believe the two people speaking in the audio

10   recordings of the defendant and his mother, Stephany Wilkins?

11   A.  I do.

12        MR. LORFING:  Your Honor, the United States moves to

13   admit Exhibits 3, 6 and 8.

14        MR. BLIZZARD:  Your Honor, may I take the witness on

15   voir dire briefly?

16        THE COURT:  You may.

17        MR. BLIZZARD:  From the lectern, Your Honor?

18        THE COURT:  Yes, sir.

19                    **VOIR DIRE EXAMINATION**

20   BY MR. BLIZZARD:

21   Q.  Agent Noack, did you listen to any of these jail

22   recordings prior to conducting the search at Mr. Regan's

23   residence?

24   A.  No, sir.

25   Q.  So you didn't have any information contained within these

1    recordings at that time, right?

2    A.  Say it again?

3    Q.  You had not listened to these jail calls that are now

4    being offered into evidence, right?

5    A.  That's correct.  I did not.

6    Q.  So you didn't have any first-hand knowledge of any

7    conversations that Mr. Regan and his mother may have had prior

8    to you obtaining consent from Stephany Wilkins?

9    A.  That is true.

10          THE COURT:  I'm sorry.  You answered before he

11   finished.  Ask that question again.

12          MR. BLIZZARD:  Yes, sir.

13   BY MR. BLIZZARD:

14   Q.  You didn't have any knowledge of these recordings prior to

15   you obtaining consent from Ms. Wilkins to search the residence

16   at 124 Private Road, 5503?

17   A.  That is correct.

18          MR. BLIZZARD:  No further questions, Your Honor.

19      We would object they are not relevant to the issues at

20   hand.  He did not have any knowledge that these conversations

21   had taken place for the purposes of acquiring consent.

22          THE COURT:  Well, I need to know more.  I think your

23   objection is a good one potentially.  Let me ask

24   Ms. Lorfing --

25          MR. LORFING:  Ms. Howey, Your Honor.

10

1          THE COURT:  I'm sorry.  I got you reversed, didn't I?

2          MR. LORFING:  Yes.  That's okay.

3          THE COURT:  Ms. Howey.

4       If he has heard the -- in a sense heard the recording and

5    recognizes the names and that's all you're offering him for is

6    to identify the speaker so that we know they are who you say

7    they are, that would not necessarily mean they can't be

8    admitted, but I don't think they can be admitted at this

9    point.

10      Do you have the ability to show relevance?

11         MS. HOWEY:  Yes, Your Honor --

12         THE COURT:  And did you offer?  I can't remember.

13   Did you offer?

14         MS. HOWEY:  Yes, I did.

15         THE COURT:  Okay.  So you've offered, right?

16         MS. HOWEY:  Yes.

17         THE COURT:  So tell me -- because I think the

18   objection is a good one.  If he didn't have that information

19   before he did the search, whatever is on there doesn't help

20   him necessarily, unless there is something I don't know.  It

21   doesn't necessarily help him prove consent.

22         MS. HOWEY:  That's certainly correct, Your Honor.  We

23   are not going to present -- this evidence does not go to

24   justify or prove the reasonableness of the consent or whether

25   there was consent there.  We offer this testimony to give the

1    Court context for where Christopher Regan was living and his

2    view of where he was living and his mother's view.  It does

3    not go to --

4              THE COURT:  What he knew.

5              MS. HOWEY:  Right.  And if you want, we can admit

6    this after we discuss the search and what he knew at the time

7    of the search?

8              THE COURT:  No.  With that explanation, I think it's

9    all right.  I overrule the objection and allow its admission

10   for the purposes that you just expressed.

11             MS. HOWEY:  Thank you, Your Honor.

12                    **DIRECT EXAMINATION** (Cont.)

13   BY MS. HOWEY:

14   Q.  I would like to, first, discuss the recording in Exhibit

15   6.  If we could play from the three minute mark to the 3:20

16   mark?

17       (Recording played at this time)

18             MS. HOWEY:  Yes.  We want to play to the 3:20.

19       (Recording played at this time)

20   BY MS. HOWEY:

21   Q.  Agent Noack, we heard Ms. Wilkins tell the defendant that

22   she went into his house and drank liquor there?

23   A.  Correct.

24             THE COURT:  Let me interrupt just a minute.  Did you

25   happen to provide transcripts?  Do you have transcripts?

```
1              MS. HOWEY:  We do not.

2              THE COURT:  Okay.  Thank you.

3    BY MS. HOWEY:

4    Q.  What did Ms. Wilkins mean by house?  What is your

5    understanding of what she meant?

6    A.  She was referring to the trailer on Lot 124.

7    Q.  What did she mean by your tequila?

8    A.  That was one of the things that were in the trailer that

9    belonged to Chris Regan.

10   Q.  What is your understanding regarding the defendant's

11   response?  How did he respond to his mother?

12   A.  Kind of laughingly, acknowledging that she did come into

13   the trailer without his permission, and she was just saying

14   that she took part in his drink.

15   Q.  If you could turn to Exhibit 8, let's talk about that, and

16   if we can start playing at the three minute, ten second mark

17   and up to the three minute, 45 mark.

18      (Recording played at this time)

19   BY MS. HOWEY:

20   Q.  What was Ms. Wilkins's concern during this conversation?

21   A.  She was in fear that there would be a search conducted of

22   her property, her trailer.

23   Q.  Did she express that she believed the search might be

24   eminent?

25   A.  Yes, ma'am.
```

13

1    Q.  What was the defendant's response?

2    A.  He just changed the subject.  He didn't acknowledge it.

3    Q.  Did he express any concern that a search might occur?

4    A.  No, he didn't.

5    Q.  Did he direct his mother in any way in regard to how she

6    should respond if the search were to occur?

7    A.  No.

8    Q.  If we could now turn to Exhibit 3 and talk about that a

9    little bit.  We're going to listen to this conversation in

10   segments.  If we could start at the 48 second mark?

11       (Recording played at this time)

12           THE COURT:  If you think that section is critical, I

13   need to hear it again.

14           MS. HOWEY:  Okay.

15       (Recording played at this time)

16   BY MS. HOWEY:

17   Q.  Agent Noack as we heard in Exhibit 6, Ms. Wilkins tells

18   her son that she was at his trailer to drink liquor as she had

19   told him in the other conversation.  Is that correct?

20   A.  That's correct.

21   Q.  In fact, she's telling him after the fact, after she was

22   at the trailer, correct?

23   A.  Yes, ma'am.

24   Q.  She's not asking his permission?

25   A.  No.

14

```
1    Q.  Did he object this time?

2    A.  No.  He thought it was humorous that she did help

3    herself.

4    Q.  Did he express any concern that his mother was entering

5    his trailer without his permission?

6    A.  No, ma'am.

7    Q.  Let's play if we can from the 4:23 mark to the 4:39 mark.

8        (Recording played at this time)

9    BY MS. HOWEY:

10   Q.  What is the defendant talking about with his mother?

11   A.  The items that belonged to him that are in that trailer.

12   Q.  And what does he tell her?  What does he have in that

13   trailer?

14   A.  One percent of his whole belongings.  He had -- based on

15   my view, he had some clothes and what identified as a couch

16   that belonged to him in that trailer.

17   Q.  Based on his statements, did he express any concern about

18   the contents in the trailer?

19   A.  No, ma'am.

20   Q.  If we could now turn or play at the 5:35 mark to the six

21   minute mark?

22       (Recording played at this time)

23   BY MS. HOWEY:

24   Q.  Agent Noack, who did Ms. Wilkins believe would search the

25   trailer?
```

15

1    A.  She was fearful that Homeland Security was going to

2    conduct a search of her property.

3    Q.  And what was the defendant's response?

4    A.  Basically, that Homeland Security couldn't do it without a

5    warrant unless she allowed us to do the search.

6    Q.  And when the defendant told his mother that law

7    enforcement could take things from the trailer only if she

8    allowed it, what did that indicate to you?

9    A.  That in his own mind, that that trailer belongs to his

10   mother, and she has sole control over it, just reaffirming

11   what I believed in the first place.

12   Q.  In your opinion, does it indicate he believed she could

13   give consent?

14   A.  Yes.

15   Q.  Did Homeland Security, in fact, search that trailer?

16   A.  We did.

17   Q.  We have established that that search occurred on March 1,

18   2019, correct?

19   A.  Yes, ma'am.

20   Q.  Did Ms. Wilkins do on March 1 what her son said she could

21   do?  Did she let them?

22   A.  Yes, ma'am.  She allowed us to search her property.

23   Q.  Let's loop back around to the time when Agent O'Leary

24   called you and asked you --

25            THE COURT:  Hold on.

16

1        You're inferring from what we just heard that the

2   defendant said that his mother could give consent.  Did you

3   just say that?

4            MS. HOWEY:  The defendant said they would take things

5   only if she let them.

6            THE COURT:  And you're inferring from that what?

7            MS. HOWEY:  That he was not there to say "yes" or

8   "no."  She was there, and the search would proceed only if she

9   let them, only if she consented to a search.

10           THE COURT:  I thought I heard you go one step further

11   and say, therefore, he consented to her consenting?

12           MS. HOWEY:  If I did, I apologize, Your Honor.

13           THE COURT:  Maybe you didn't.  Go ahead.

14   BY MS. HOWEY:

15   Q.  Turning back to your conversation with Agent O'Leary prior

16   to the search.  Let's talk about that.  You testified that

17   Agent O'Leary asked you to go to Ms. Wilkins's home to remove

18   items from her trailer?

19   A.  That's correct.

20   Q.  Was this a telephone call you had with Agent O'Leary?

21   A.  It was.

22   Q.  Is she the case agent in this criminal action?

23   A.  Yes, ma'am.

24   Q.  We established that she is stationed in San Angelo,

25   correct?

1    A.   Correct.

2    Q.   And we've established that she would call and ask you

3    because the search was outside of her jurisdiction, correct?

4    A.   That's correct.

5    Q.   What did Agent O'Leary tell you about the search that she

6    wanted you to conduct?

7    A.   She said that she was contacted by Stephany Wilkins, and

8    Ms. Wilkins was concerned that there might be evidence of

9    child pornography in her trailer and that she was asking

10   Homeland Security to come and retrieve that evidence, get it

11   out of her trailer.  She didn't want it on her property.

12   Q.   Just to be clear.  That's kind of a long sentence.

13        Ms. Wilkins told Agent O'Leary that she wanted items

14   removed because she didn't want it in her trailer?

15   A.   That's correct.

16   Q.   And did Agent O'Leary give you a timeline as to when the

17   search should occur?

18   A.   She requested it be as soon as possible just to make sure

19   nothing was tampered with or the evidence disappeared or was

20   damaged.

21   Q.   And how soon were you able to get there?

22   A.   In about an hour.

23   Q.   And when you got there, please tell the Court again where

24   did you arrive?

25   A.   I arrived at the property owned by Stephany Wilkins

18

1    physically at her trailer, which is on Lot 20, which is

2    adjoining to the 124 lot.

3    Q.  Just to be clear, would her lot be Lot 120?

4    A.  Yes, ma'am, that's correct.

5    Q.  And what was the property that you were to search?

6    A.  I was to search Lot 124.

7    Q.  And tell us about the trailers that you saw.  Were they

8    close in proximity?

9    A.  Approximately 40, 50 yards apart.

10   Q.  And what did you do when you got there?  So we've

11   established what it looked like.  You parked your car.  What

12   happened?

13   A.  I approached the residence of 120, and I was met at the

14   door by Ms. Wilkins.  I produced my credentials and introduced

15   myself.

16   Q.  And were you there at the search alone when you arrived?

17   A.  When I arrived, I was with a local sheriff's deputy.

18   Q.  And did he conduct the search with you?  Did he remain

19   there?

20   A.  No, ma'am.  It was just a an officer safety issue.  He

21   just accompanied me there.  Once I introduced myself and we

22   established that the scene was not a threat, I released the

23   deputy.

24   Q.  Did you expect anyone from your agency to join you, or

25   were you going to conduct the search alone?

19

1    A.  Yes, ma'am.  Previously, I contacted my partner, Special

2    Agent Burton Reavis, and told him when I was going and that he

3    was on his way, but he was, probably, ten minutes or so

4    minutes behind me.

5    Q.  So I assume you waited for Agent Reavis?

6    A.  That's correct.

7    Q.  What did you do while you waited?

8    A.  Just made small talk with Ms. Wilkins, such as she kind of

9    pointed out her property, the ownership of the two trailers,

10   such as that.

11   Q.  What we have established?

12   A.  Yes, ma'am.

13   Q.  What happened after Agent Reavis arrived?

14   A.  I introduced Special Agent Reavis as my partner.  He

15   produced his credentials, and then we presented a consent to

16   search form to Ms. Wilkins, and I said that this was,

17   basically, what we need to do in order to conduct a search.

18          THE COURT:  You said, basically?  Repeat?  You said,

19   basically, what?

20          THE WITNESS:  That she wouldn't have to sign this for

21   us to be allowed to search her property.

22   BY MS. HOWEY:

23   Q.  Agent, if you would please turn to Exhibit 1 in the

24   notebook?

25   A.  Yes, ma'am.

20

1    Q.  Do you recognize this exhibit?

2    A.  Yes, ma'am.

3    Q.  Can you please identify this exhibit?

4    A.  This is the consent to search form that I gave to

5    Ms. Wilkins.

6    Q.  Did Ms. Wilkins sign this consent form?

7    A.  Yes, ma'am.

8    Q.  Did you also sign the consent form?

9    A.  I did.

10   Q.  Is Exhibit 1 a true and correct copy of the consent form

11   that you and Ms. Wilkins signed on March 1, 2019?

12   A.  Yes, ma'am.

13          MS. HOWEY:  Your Honor, the United States moves to

14   admit Exhibit 1.

15          MR. BLIZZARD:  No objection, Your Honor.

16          THE COURT:  Exhibit 1 is admitted.

17          MS. HOWEY:  Your Honor, permission to publish as

18   well?

19          THE COURT:  Granted.

20   BY MS. HOWEY:

21   Q.  Agent Noack, why did you ask Ms. Wilkins to sign the

22   consent form?

23   A.  It's standard operating procedure.  If we are to search

24   any property, we must first get either a warrant or a consent

25   to search said property.

U.S. DISTRICT COURT

21

1   Q.  And you explained that to Ms. Wilkins?

2   A.  Yes, ma'am.  I read it verbatim, the form, and then she

3   signed it.

4   Q.  And you were there on the scene.  Was her signature

5   voluntary?

6   A.  Yes, ma'am.

7   Q.  And she wanted you to search?

8   A.  She requested that we search the property, yes.

9   Q.  What made you think that she could give consent, that she

10  had the authority to sign this form?

11  A.  Just based on her statements, that she owned the property,

12  that that was her trailer, and that she was allowing Chris

13  Regan to stay there.

14  Q.  And was there anything else that led you to believe that

15  she had the right to consent?  Did she call your agency and

16  ask?

17          MR. BLIZZARD:  Objection to leading.

18          THE COURT:  Sustained.

19  BY MS. HOWEY:

20  Q.  Was there anything else that you spoke to Ms. Wilkins

21  about that day that made you believe that you had consent to

22  search?

23  A.  I was asking questions such as, you know, who owned the

24  property, how long she's had it.  Was Chris paying anything?

25  Was it rent or utilities, electric bill or anything like that?

1    And she said, no.

2    Q.  Did she have a key to the residence?

3    A.  She did.

4    Q.  Where was that key?

5    A.  She had it in her trailer, in her possession.

6    Q.  Was it a single key?  Was it on a key ring?  Do you

7    recall?

8    A.  I can't honestly recall, no.

9    Q.  Did she go into the trailer to get the key, or was it with

10   her already?

11   A.  I can't recall that either.  I'm sorry.

12   Q.  Okay.  What happened after Ms. Wilkins signed the consent

13   form?

14   A.  She escorted us over to the trailer.  She went up to the

15   previously locked door.  She unlocked the door and then

16   escorted us inside.

17   Q.  What happened when she escorted you inside?  What was your

18   impression of the trailer?

19   A.  It looked in a state of unpacked.  There were boxes on the

20   counter.  There were a few dishes stacked out.  You can see

21   invisible -- there were a couple of dry goods on the shelf and

22   then just, you know, kind of cluttered like they were in mid

23   move-in, unpacked.

24   Q.  So you made kind of an assessment of the situation?

25   A.  Yes, ma'am.

1    Q.  The surroundings.  What happened next?

2    A.  Ms. Wilkins said the items were in the back bedroom.  So

3    she escorted us back to the bedroom and kind of pointed out

4    where the items we were there to retrieve were.

5    Q.  And were the items that she wanted removed where she

6    pointed, where she said they would be?

7    A.  Yes, ma'am.

8    Q.  And what happened next?

9    A.  She kind of stepped out of the room, and my partner and I

10   began our search.  I retrieved the items where she pointed

11   them out, which were little SIM video storage disks, in the

12   top right drawer of the nightstand, and in plain sight was a

13   leather case containing a video camera and some tapes that

14   Ms. Wilkins said was there.

15           THE COURT:  Excuse me.

16      Did Ms. Wilkins ever say to you right then or at any time

17   that you were there why she wanted these items removed?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  What did she say?

20           THE WITNESS:  She was concerned there was child

21   pornography on these items, and she was distraught, possibly,

22   that it might contain her own grandchildren, pictures and

23   videos.

24           THE COURT:  Did she say -- that's certainly motive

25   enough to want them out of there, but did she express any

24

1    concern about her own culpability or liability?

2         THE WITNESS:  Yes, sir.  Yes, sir, she did.  She said

3    she wanted them out of that house because she didn't want to

4    get in trouble for it, anything that might be in that house.

5         THE COURT:  Thank you.

6    BY MS. HOWEY:

7    Q.  Did Ms. Wilkins express any other concerns in regard to

8    these items?  Did she have any fears?

9    A.  That if by other means, if we were to do a search,

10   Homeland Security, that if they were found on her property,

11   that she could be held responsible for those items.

12   Q.  Did she express any concern about what might be on -- you

13   said that you found SIM cards?

14   A.  Correct.

15   Q.  So let's back up.  Let's explain what a SIM card is?

16   A.  It's just a small digital recording item that can hold

17   either images or video.

18   Q.  And we've established that Ms. Wilkins was concerned that

19   there was child pornography on these storage devices, correct?

20   A.  That was her concern.

21   Q.  Did she have any other concerns?

22   A.  Well, other than she was, like I said, distraught that

23   there might be a possibility that it may contain her own

24   grandchildren on those items.

25   Q.  And did she ask you to do anything to ease those fears?

25

1    A.   She did.  She wanted to know what was on them.

2    Q.   And what did you say to her?

3    A.   I said, I can check right now.  There was a camera, also,

4    retrieved, a little video one-shot stop.  I can't remember the

5    type, but it was a video camera that accepted these type of

6    video cards.  I placed several of the cards into the camera to

7    look and see if there's any images available.

8    Q.   And what did you see?

9    A.   There were no images that came up.  Possibly, it was the

10   wrong format for that camera to match up with those video

11   cards.  So I removed them, but before I removed them, I could

12   tell that there was data stored on these cards.  It just

13   wasn't the right format to access them.  So I took these items

14   just to be safe.

15   Q.   And did that allay any of Ms. Wilkins's concerns?

16   A.   Not really.

17   Q.   You said that you looked.  You did not see any images?

18   A.   Correct.

19   Q.   Did you conduct a forensic search?

20   A.   No, ma'am.  This was just a cursory glimpse.

21   Q.   Is that something that your agency does when you conduct a

22   search?

23   A.   It is a common practice, yes.

24   Q.   What happened next?

25   A.   After I completed the search of that room, I gathered up

1    the evidence that I found, and I brought it to the kitchen in

2    order to document and bag and tag the evidence.

3    Q.  Okay.  And did you talk with Ms. Wilkins at this time?

4    A.  Yes, ma'am.  Ms. Wilkins was sitting at the table that I

5    was filling out the forms, and we were talking while we were

6    sitting there.

7    Q.  Again, was it small talk like the kind you had prior to

8    the search?

9    A.  Yes, ma'am.  She was very distraught.  She was asking

10    questions like, you know, I can't believe my son could do

11    this, and do I think what they said was true.  I said, this is

12    an ongoing investigation and I couldn't really talk about

13    that.  And then I asked questions -- I asked again the

14    questions, you know, does he pay rent?  Does he pay utilities?

15    Q.  What was her answer to those two questions?

16    A.  I'm sorry?

17    Q.  What was her answer to those two questions?

18    A.  Oh, no, he never paid utilities.  He didn't pay rent.

19    This was her trailer.  She was just letting him stay there.

20    Q.  Did she tell you whether she owned the trailer or was

21    renting the trailer?

22    A.  She had owned that trailer -- she said that she owned that

23    trailer.

24    Q.  And how long did she own the trailer?

25    A.  Later I found out, approximately, seven years.

1   Q.  And you may have already testified to this, and if so, I

2   apologize.  Did she tell you why Christopher Regan was staying

3   in the trailer?

4   A.  Yes, ma'am.  She said that he requested to stay -- he knew

5   the trailer was empty, and he asked if he could stay in the

6   trailer.  He wanted to, basically, kind of set up house in

7   hopes to retrieve his kids from Child Protective Services

8   custody.

9   Q.  Was it Ms. Wilkins's expectation that Christopher Regan

10  and the children would stay at that trailer at some point in

11  the future?

12  A.  That was her hope, yes.

13  Q.  Did the children actually stay in the trailer?

14  A.  No, ma'am.

15  Q.  Did Christopher Regan, what was her -- what did she say

16  about that?

17  A.  I asked, I said, how often was he there?  She said he was

18  there off and on, but to her knowledge, he had never even

19  stayed the night there.

20  Q.  I would like to turn to Exhibit 7 in the exhibit notebook.

21  A.  Yes, ma'am.

22  Q.  Before we talk about Exhibit 7, we've discussed somewhat

23  the items that you and your partner removed from the trailer.

24  Could you go ahead and give us another kind of explanation of

25  what those were in regard to categories of items?

28

1    A.  Just to clarify, like the items themselves?

2    Q.  Yes, categories.  You talked about a SIM card.  That would

3    be a storage device.

4    A.  Okay.  Storage devices, several SIM cards, two millimeter

5    tapes that go into a video recording camera, a cell phone, and

6    two cameras themselves, a video camera and then like the

7    little one-shot that I talked about earlier.

8    Q.  You said you conducted the inventory for the items, not

9    your partner, correct?

10   A.  Correct.

11   Q.  Back to Exhibit 7, do you recognize the exhibit?

12   A.  Yes, ma'am.

13   Q.  Can you identify the exhibit for the Court?

14   A.  It is a search and seizure warrant to do a forensics

15   analysis of the video items.

16   Q.  You just said warrant.  Did a judge sign that warrant?

17   A.  Yes, ma'am.

18   Q.  On what date did he sign the warrant?

19   A.  The judge signed it March 20, 2019.

20   Q.  Does this exhibit also contain an application for the

21   warrant that the judge signed?

22   A.  Yes, ma'am, there is.

23   Q.  What was the date of that application?

24   A.  The date it was signed was March 20, 2019.

25   Q.  Did your agency apply for this warrant?

29

1    A.  Yes, ma'am, the case agent, Marisol O'Leary.

2    Q.  And does the warrant authorize a forensic search of the

3    items that you and your partner retrieved from the trailer on

4    March 1, 2019?

5    A.  That is correct.

6    Q.  Is Exhibit 7 a true and correct copy of the warrant that

7    authorized your agency, Department of Homeland Security

8    Investigations, to search the items and seize evidence of

9    crimes from the items you seized from the trailer?

10   A.  Yes, ma'am.

11        MS. HOWEY:  Your Honor, the United States moves to

12   admit Exhibit 7.

13        MR. BLIZZARD:  No objection.

14        THE COURT:  Exhibit 7 is admitted.

15        MS. HOWEY:  Your Honor, permission to publish as

16   well.

17        THE COURT:  Granted.

18        MS. HOWEY:  Thank you.

19   BY MS. HOWEY:

20   Q.  Agent Noack, based on the conversations that you had with

21   Ms. Wilkins on March 1, 2019, did you believe she owned the

22   trailer at Lot 124?

23   A.  I did.

24   Q.  Did you believe she had authority to consent to a search

25   of that trailer?

1    A.  I did.

2    Q.  Did you believe she had authority to take you to that

3    trailer and ask you to remove items from the trailer?

4    A.  I did.

5           MS. HOWEY:  No further questions, Your Honor.

6           THE COURT:  Cross examination.

7           MR. BLIZZARD:  Thank you, Your Honor.

8                    **CROSS EXAMINATION**

9    BY MR. BLIZZARD:

10   Q.  How are you this morning?

11   A.  Very good, sir.

12   Q.  I want to start by going through the timeline with you a

13   little bit and discuss what information you knew prior to

14   obtaining Ms. Wilkins's consent?

15   A.  Okay.

16   Q.  In some of your testimony, it sounded like some of the

17   conversations took place after the search.  Is that right?

18   A.  I had spoken to Ms. Wilkins several times, yes.

19   Q.  For example, you said you were sitting at a table filling

20   out forms, tagging it, and that you were going over more

21   information at that time, right?

22   A.  Yes, ma'am -- sir.  Sorry.

23   Q.  That's okay.

24       So the information you had from Agent O'Leary was that

25   Ms. Wilkins had called and wanted SIM cards retrieved from the

1    trailer that you ultimately went into, correct?

2    A.  Yes, sir.

3    Q.  And the information conveyed by Agent O'Leary does not

4    contain any sort of exigent circumstances, does it?  She

5    didn't convey to you that she thinks this is going to be

6    destroyed or taken away or anything like that, did she?

7    A.  She expressed her concern that, yeah, that's a

8    possibility.

9    Q.  Agent O'Leary did?

10   A.  Yes, over the phone conversation we had.

11   Q.  That Ms. Wilkins had conveyed that to her and that's why

12   you were going?

13   A.  I don't know the conversation that Ms. Wilkins had with

14   Agent O'Leary, but it was inferred to me that, yeah, that it

15   was -- I don't know who made -- saying it was critical whether

16   it was Agent O'Leary or Ms. Wilkins.

17   Q.  It's unclear who decided that it needed to be done quickly

18   to you?

19   A.  Correct --

20   Q.  Either Ms. Wilkins or Agent O'Leary?

21   A.  Well, O'Leary expressed to me that it was time critical.

22   Q.  All right.  And you're not sure if that went all the way

23   back to Ms. Wilkins or not?

24   A.  I do not.

25   Q.  Ms. Wilkins did not express that to you on the scene

32

1    either, did she?

2    A.   No.

3    Q.   That it was time critical?

4    A.   No -- well, she wanted it out of the house, and she was

5    very adamant about that.

6    Q.   But she didn't express that it was time critical?

7    A.   No.

8    Q.   So Agent O'Leary expresses to that Ms. Wilkins believes

9    there is some child pornography potentially on SIM cards in

10   this residence of a trailer she owns, correct?

11   A.   That's correct.

12   Q.   And as a side note, this was not your first entry into

13   this case, right?

14   A.   No, sir.

15   Q.   You actually spent some time interrogating Mr. Regan on

16   February 13, correct?

17   A.   Yes, sir.

18   Q.   He underwent a polygraph examination, and after the

19   polygraph, you went in and spoke with him?

20   A.   That's correct.

21   Q.   And during that conversation that you had with Mr. Regan,

22   he, in fact, told you that was his residence, correct, 124

23   Private Road, 5503?

24   A.   Yes.

25   Q.   And you had no reason to doubt him at that moment, did

1   you, when he told you that information?

2       Let me put it this way.  Did you have a belief that he

3   lived somewhere else?

4   A.  I did.

5   Q.  Was that with Miss Peoples?

6   A.  That was with his wife, who I learned was staying with

7   Ms. Peoples.

8   Q.  So that was your belief that he was staying over there?

9   A.  Correct.

10  Q.  But he contended to you that he was staying over at the

11  trailer by his mother's?

12  A.  Several times he said that he was staying at the trailer,

13  and his wife was staying with Miss Peoples.

14  Q.  All right.  When you filled out an inventory form in this

15  case -- do you recall doing that?

16  A.  Yes, sir.

17  Q.  You actually indicated the residence being seized from

18  Christopher Regan, correct?

19  A.  Yes.

20  Q.  You didn't indicate that it was Stephany Wilkins's

21  residence, did you?

22  A.  I believe I did in the comments, did I not?

23  Q.  Well, I'm looking at a custody receipt of seized evidence,

24  and under Number 9, it says seized from Christopher Regan,

25  right?

34

1    A.  Yes, sir.

2    Q.  And his address is noted as 123 -- which I think may have

3    been a typo?

4    A.  Yes, it's 123.

5    Q.  Private Road, 5503, right?

6    A.  Correct.

7    Q.  And this is the seizing -- and I apologize if I

8    misrepresented this, but this is the seizing of a phone that

9    you did when you arrested him on February 13?

10   A.  Oh, okay.  That's different.

11   Q.  Right?

12   A.  Yes, sir.

13   Q.  So that form indicates, again, a reiteration that the

14   government was classifying 123, 124 as his residence,

15   correct?

16   A.  That's what Mr. Regan gave to me as his residence.

17   Q.  Right.  And that's what you put down, right?

18   A.  Yes, sir.

19   Q.  Stepping back to where we were a minute ago, when you were

20   talking to Ms. Wilkins on the scene, did she convey to you

21   that her son had given her permission to let Homeland Security

22   or other government agents into that trailer at 124?

23   A.  No.

24   Q.  Did she convey to you that she did allow Chris to live

25   there?

35

1    A.   Correct.

2    Q.   Okay.  And have you done many searches of homes and

3    residences?

4    A.   Yes, sir.

5    Q.   Okay.  Would you agree with me that a telltale sign of

6    residency is finding someone's clothes?

7    A.   Yes, sir.

8    Q.   That tends to indicate they live there, right?

9    A.   Or storing property there, yes.

10   Q.   You went into a bedroom.  There were sheets on the bed,

11   clothes, covers?

12   A.   There was, right.

13   Q.   This dresser that you retrieved the items from were in his

14   master bedroom, correct?

15   A.   Yes, sir.

16   Q.   And so on that date in question, did you have the

17   opinion that -- and we're just talking hypothetically your

18   opinion, okay?

19   A.   Okay.

20   Q.   Did you have the opinion that a landlord has the ability

21   to convey consent to a tenant -- of a tenant's property to

22   you?

23   A.   No.

24   Q.   Okay.  So your view in that situation was that Ms. Wilkins

25   was not his landlord?

36

1    A.  That is correct.

2    Q.  Because, otherwise, you wouldn't have searched, right?

3    A.  I would have still removed the property at her request,

4    but I would not have conducted a search of the property, no.

5    Q.  Well, I guess I don't understand the difference.  You

6    would have still gone into the residence, and you would have

7    retrieved those items, correct?

8    A.  Yes, sir.

9    Q.  So when I say search, you're implying something broader

10   than that, you looking around and opening other drawers and

11   things like that?

12   A.  Yes, sir.

13   Q.  So no matter what, you would have entered that day and you

14   would have taken those items?

15   A.  Not necessarily.  I would have had her retrieve those

16   items for me if she wanted to turn them over.

17   Q.  Okay.  Well, a minute ago you said you would have entered

18   and taken the items, right?

19   A.  I don't know if I did but, okay.

20          THE COURT:  What I heard him say was, or I inferred

21   from what he said, was that he would have retrieved them

22   for her -- I think that's the word he used -- he would have

23   retrieved them for her, but he did not say he would have taken

24   them.

25          MR. BLIZZARD:  All right.  Thank you, Your Honor.

37

1          THE COURT:  Now, did I --

2          THE WITNESS:  That's what I meant, sir, yes, sir.

3          THE COURT:  That's what I understood.

4     BY MR. BLIZZARD:

5     Q.  All right.  And if Ms. Wilkins would have refused to

6     retrieve the items, then what would you have done?

7     A.  I would have contacted the AUSA and ask what he wanted to

8     do, either apply for a warrant, would be our back-up plan.

9     Q.  Do you know how many warrants have been executed in this

10    case?

11    A.  Exactly, no.

12    Q.  You know there's numerous, right?

13    A.  I imagine, yes, sir.

14    Q.  Was there anything that prohibited you from obtaining a

15    warrant to stay?

16    A.  Only that Agent O'Leary inferred on me that it was time

17    critical that I retrieve the items to make sure nothing

18    happened to them.

19    Q.  Sure.  But it wasn't Chris that was going to do anything

20    to them, right, because he's in jail?

21    A.  That's correct.

22    Q.  It wasn't Tanya that was going to do anything to them

23    because she's in jail?

24    A.  That's correct.

25    Q.  And the only other person who appeared to know about them

38

1   was reporting them to you?

2   A.  That's correct.

3   Q.  So was there some other person that you or Agent O'Leary

4   feared would take these items?

5   A.  No, sir.

6   Q.  Ms. Wilkins conveyed to you prior to the search, did she

7   not, that part of the deal was that Chris would fix up the

8   place in exchange for rent?

9   A.  That's what he said.  I don't remember her saying that.

10  He said he was going to fix up the place, but it wasn't in

11  exchange for rent or anything like that.

12  Q.  Okay.  You didn't understand it to be that he would fix up

13  the place in exchange for living there?

14  A.  The way I took it was he was fixing up the place in order

15  for him to live there.

16  Q.  All right.  Is it your position today -- as you've given a

17  lot of opinions on Chris's mentality during the jail calls, is

18  it your position today that Mr. Regan intended for Ms. Wilkins

19  to give consent to the government to search his residence?

20  A.  No.  He specifically said that the government could only

21  search his place if she gave consent.  He had no ownership of

22  it.

23  Q.  Right.

24      It appeared from the tone and demeanor of that

25  conversation, did it not, that he did not want the residence

39

1    searched, right?

2    A.  He never said, don't let them search.  He said, only you

3    can give them that ability to search.

4    Q.  And I understand.  That's why I'm talking about the tone

5    and the demeanor.  I'm not saying what he said.  But by the

6    tone and the demeanor, it wasn't, hey, go let them search.  It

7    was, well, they're only getting in there if you let them

8    search, right?

9    A.  Yes, sir.

10   Q.  And the demeanor was, I don't want them to search, right?

11   A.   He did not infer that.  He seemed like -- he even said in

12   some of the conversations -- I don't know which one -- he

13   says, there is nothing in there for them to take.  And I

14   believe one of the conversations from Ms. Wilkins was, is

15   there something in there that I need to get out?  And he said,

16   no, there is nothing in there.

17   Q.  All right.  When you got to the scene, did you take a look

18   around the outside?

19   A.  Not closely, no.

20   Q.  Did you notice that there was a mailbox that had

21   Christopher Regan's name on it?

22   A.  I saw a mailbox that had Regan on it, yes.

23   Q.  That would be him, right, not Ms. Wilkins, who doesn't

24   share the same last name, right?

25   A.  Yes.

40

1   Q.  Were you, in fact, instructed to get consent to search on

2   this by Agent O'Leary?

3   A.  I don't recall being instructed to get consent.  I just

4   know if I don't have a warrant, I have to get consent.

5   Q.  Did Ms. Wilkins point out to you the number of items that

6   Chris had fixed up while he stayed there?

7   A.  No, sir, not at the time.

8   Q.  So to be clear, taking us back to our original point here,

9   what you had was a reported address of Mr. Regan living at 124

10  Private Road, right?

11  A.  Yes, sir.

12  Q.  You arrived on the scene.  You spoke with Ms. Wilkins.

13  She conveyed her concern over these cards, right?

14  A.  Yes, sir.

15  Q.  She indicated she owned the place?

16  A.  Yes, sir.

17  Q.  Paid utilities, taxes?

18  A.  Yes, sir.

19  Q.  But she never conveyed to you that Chris had gave her

20  permission to allow you to search, did she?

21  A.  No.

22  Q.  And she conveyed to you that this is a place that she

23  allowed Chris to live?

24  A.  Right.

25  Q.  And he had things of his own in that residence?

1    A.  Yes, sir.

2            MR. BLIZZARD:  May I have just a moment, Your Honor?

3            THE COURT:  Sure.

4        (Brief pause in proceedings)

5            MR. BLIZZARD:  No further questions, Your Honor.

6            THE COURT:  Redirect?

7            MS. HOWEY:  Thank you, Your Honor.

8                        **REDIRECT EXAMINATION**

9    BY MS. HOWEY:

10   Q.  Agent Noack, I would like to talk a little bit about the

11   jail calls that we discussed earlier.

12       You have been very clear that you did not listen to those

13   calls prior to the search?

14   A.  That's correct.

15   Q.  They did not form the basis of your belief that

16   Ms. Wilkins could consent, and based on that consent, you

17   could search that trailer.  Is that correct?

18   A.  That's correct.

19   Q.  Based on what you heard, after the fact, is it apparent

20   that Ms. Wilkins had authority to consent to a search?

21   A.  Based on those conversations, it reconfirmed what I

22   already knew that she came and went and that was her

23   property.

24   Q.  Based on what you heard, Christopher Regan never objected

25   to her repeated entry into the trailer.  Is that correct?

1    A.  No, ma'am.

2    Q.  He had no concern about a search of that trailer.  Is that

3    correct?

4    A.  No, ma'am.

5    Q.  He never gave her any direction in regard to the search

6    other than it would happen only if she allowed it.  Is that

7    correct?

8    A.  That's correct.

9    Q.  In what context did Regan tell you that he lived at 124

10   Private Road at the time you interrogated him?

11        Let me ask it a different way.  I'm sorry.

12        Why were you asking that question?  Was it to establish

13   his residence, where he lived or --

14   A.  Yes, ma'am.

15   Q.  -- was it for record keeping purposes, what was it?

16   A.  It was just part of the biographical -- where he lived,

17   his residence.  He told me that he was staying at that

18   residence and that Tanya, his wife, was staying with Miss

19   Peoples, and that he had no contact with her at all, that they

20   weren't ever together, which I later found out was not true.

21   Q.  Let's take about the inventory you did on the date of the

22   arrest.

23   A.  Yes, ma'am.

24   Q.  You also placed -- you indicated his residence on that

25   inventory as well?

43

1    A.  Yes.

2    Q.  Is that correct?

3    A.  Uh-huh.

4    Q.  Whether you thought it was his residence, where he lived

5    or he kept his things or for record keeping purposes only, did

6    your opinion change -- or did you form an opinion afterward as

7    to whether he lived at 124 Private Road?

8    A.  No.  At that point is the day after I got the collateral.

9    So I didn't know hardly anything about Mr. Regan.  So the

10   address that I wrote down is just the address that I had.

11   Q.  So you're saying at that point it was just a fact that you

12   put on paper?

13   A.  I had to put something on that paper, yes.

14   Q.  Did you later understand that that was not Christopher

15   Regan's residence?

16   A.  Yes, ma'am.

17   Q.  Was that based upon your interactions with Ms. Wilkins on

18   March 1, 2019?

19   A.  Yes.  She established that, yes.

20   Q.  Mr. Blizzard asked you about as to whether the defendant

21   granted you permission, whether he told his mother that she

22   could give you permission.

23       Did you think you needed permission from Christopher Regan

24   to search the property at 124 Private Road?

25   A.  No, ma'am.  I did not believe that Christopher Regan

1    stayed there.  I believe that he was only keeping his property

2    there.

3    Q.  In regard to the clothing that Mr. Blizzard asked you

4    about, you testified earlier that the trailer looked like it

5    was in kind of a situation of unpacked, somebody was moving

6    in?

7    A.  Correct.

8    Q.  Did you look in the closet?  Do you remember what the

9    clothing was in the closet?

10   A.  There was male clothing hanging in the closet.  There was

11   probably, I'm guessing, four or five pair of pants, half a

12   dozen shirts, some shoes in the closet on the floor, some

13   female clothing, also.  But that was just in that closet.  The

14   other bedroom that no one was staying in at all was just a

15   catch-all that had a bunch of stuff in it.  There was more

16   female clothing found in there.

17   Q.  You also talked about -- Mr. Blizzard asked you some

18   questions about landlord tenant situations?

19   A.  Uh-huh.

20   Q.  Did you believe that there was a landlord tenant situation

21   here?

22   A.  No, ma'am.

23   Q.  What was that based upon?

24   A.  Just based that he didn't pay rent.  He didn't pay

25   utilities.  She said that was her property, and she was just

45

1    allowing him to stay there.

2    Q.  Mr. Blizzard also asked about the name Regan on the

3    mailbox?

4    A.  Correct.

5    Q.  Would that have changed what you did that day?

6    A.  No, ma'am.  Based on that, Ms. Wilkins said that she was

7    on that property for 40 years.  I don't know what her previous

8    names have been.  It could have been from when she was there,

9    and she just left it on Regan on that mailbox.

10   Q.  Would it be reasonable to believe that at some point in

11   time, because she's the mother of Christopher Regan, her name

12   might have been Regan?  The last name might have been Regan?

13   A.  Yes.

14   Q.  Is this the type of property that looks like once a month

15   there's just someone tending the grounds, checking names on

16   mailboxes, making sure the curtilage is all in order?

17   A.  It's a trailer park.  I can only say -- a couple of times

18   that I've been there, sometimes the grass was mowed.

19   Sometimes it wasn't.  It doesn't look like a lot of changes

20   are made to that area, no.

21   Q.  Let's talk about why you didn't apply for a warrant.

22   You've indicated that you believe that time was of the

23   essence.  Is that correct?

24   A.  Yes.

25   Q.  And you indicated that Agent O'Leary told you that

1    Ms. Wilkins wanted items removed from the trailer?

2    A.  Yes.

3    Q.  When you arrived there, did you believe Ms. Wilkins to

4    give authority?

5    A.  Yes, ma'am.

6    Q.  To consent.

7        Even if there were no exigent circumstances, would you

8    have applied for a warrant based on what you had learned from

9    Agent O'Leary and Ms. Wilkins?  If time is not of the

10   essence --

11   A.  Yes.

12   Q.  -- would you have just taken your time and gone to get a

13   warrant?

14   A.  Yes.

15   Q.  You would have?

16   A.  Yes, just because it's more complete.  It takes away this

17   whole argument of whether consent or not -- if I absolutely

18   knew that the evidence would not be missing or destroyed or

19   time critical, there is no reason why I wouldn't get a

20   warrant.

21   Q.  If when you arrived and spoke with Ms. Wilkins, if she had

22   told you different things, if your conversation would have

23   been different and you thought that she could not give consent

24   to search, what would you have done?

25   A.  I would have to get a warrant.

1   Q.  But you did not believe you needed a warrant?

2   A.  No, ma'am.

3   Q.  I've asked you about the jail calls.  Let's go back to

4   those.  Again, those did not influence your decisions on

5   March 1.

6   A.  No, ma'am.

7   Q.  At this point, though, you believe that they show apparent

8   authority, that Ms. Wilkins had apparent authority to --

9   actual authority, excuse me, actual authority.  She had

10  authority, clear and simple, to allow the search?

11  A.  Yes, ma'am.

12  Q.  Based on those conversations, was Christopher Regan ever

13  concerned about a search of the trailer?

14  A.  No, ma'am.

15  Q.  Did he ever instruct his mother what to do if an agent

16  came to search?

17  A.  In a prior conversation, when he said that -- those items

18  that were in there, he believed that Tanya placed them there

19  and was trying to frame him, and he requested that his mother

20  get rid of that, get rid of that evidence.

21  Q.  In the jail calls, did Christopher ever say that the

22  trailer on Lot 124 was his property?

23  A.  No.

24  Q.  Did he ever prevent his mother from entering and exiting

25  without permission?

1    A.  No, ma'am.

2    Q.  Was it apparent to you that she was able to do so and that

3    she had equal use of that trailer and could use it as she

4    pleased, even to drink tequila?

5    A.  Yes, ma'am.

6    Q.  And when she entered and exited and told her son about it

7    after the fact, he never complained?

8    A.  No, ma'am.

9    Q.  Do you believe he had an expectation of privacy in that

10   trailer?

11   A.  No, ma'am.

12        MS. HOWEY:  No further questions, Your Honor.

13        THE COURT:  You may step down, sir.

14      Please call your next witness.

15        MR. LORFING:  Your Honor, the government calls

16   Stephany Wilkins to the stand.

17        THE COURT:  Good morning.

18        THE WITNESS:  Good morning.

19        THE COURT:  Please step over here.  Please raise your

20   right hand and be sworn.

21      (Witness sworn by the Court)

22        THE COURT:  Please be seated, ma'am.

23      You may proceed.

24        MR. LORFING:  Thank you, Your Honor.

25       STEPHANY WILKINS, testified under oath as follows:

49

**DIRECT EXAMINATION**

BY MR. LORFING:

Q.  Good morning, ma'am.

A.  Good morning.

Q.  Would you please state your name and spell your last name

for the record?

A.  Stephany Wilkins, W-I-L-K-I-N-S.

Q.  Ma'am, are you related to the defendant, Christopher

Wilkins (sic)?

A.  Yes, I am.

Q.  And how are you related?

A.  He's my son.

Q.  Your biological son?

A.  Yes.

Q.  You love your son, obviously?

    Ma'am, we're going to need you to verbalize your

response.

A.  Yes, yes.

Q.  I know this is very difficult for you.  I am going to try

to make this as quickly as possible, so if you can make sure

you just listen to my question and answer directly?

A.  Okay.

Q.  I apologize in advance for calling you, ma'am.

    Ms. Wilkins, do you believe that your son, Christopher

Regan, had any right of privacy in the trailer located at 124

1    PR, 5503.

2    A.   No, I did not.

3    Q.   Who owns the trailer at 124 PR, 5503?

4    A.   My husband and I.

5    Q.   Ma'am, you have an exhibit book in front of you.  Do you

6    see it down there?

7    A.   Yes.

8    Q.   Can you please turn to Tab 11?

9    A.   11?

10   Q.   Yes, ma'am.  Do you see those documents there, ma'am?

11   A.   I'm looking.

12        There we go.  Okay.  Yes, I've got it.

13   Q.   Do you recognize those documents?

14   A.   I do.

15   Q.   How do you recognize those documents?

16   A.   That's a history of my taxes I pay on our property.

17   Q.   Did you physically obtain a copy of those from the

18   appraisal district?

19   A.   I did.

20   Q.   Are those the same copy of your tax records that you

21   provided directly to me?

22   A.   Yes, sir.

23   Q.   Do they appear to be altered in any way?

24   A.   No.

25        MR. LORFING:  Your Honor, at this time the government

51

1    would move to admit Government's Exhibit 11.

2              MR. BLIZZARD:  No objection.

3              THE COURT:  Exhibit 11 is admitted.

4              MR. LORFING:  Thank you, Your Honor.

5    BY MR. LORFING:

6    Q.  Ms. Wilkins, who pays the utilities on the property

7    located at 124 PR, 5503?

8    A.  My husband and I.

9    Q.  Ma'am, if you can flip to Tab 10?

10   A.  Okay.

11   Q.  Do you recognize those documents?

12   A.  Yes, I do.

13   Q.  What do you recognize those documents to be?

14   A.  These are my electric bills for the trailer.

15   Q.  Are those the same electrical bills that are mailed

16   directly to your address?

17   A.  They are.

18   Q.  Is that your handwriting on those documents?

19   A.  It is.

20   Q.  Are these the same electric bills that you provided to

21   me?

22   A.  Yes, they are.

23   Q.  Do they appear to be altered in any way?

24   A.  No, they're not.

25   Q.  Do they show the electric bills for the property at 120

52

1   PR, 5503, as well as 124 PR, 5503?

2   A.  Yes.

3   Q.  Ma'am, just to help out our court reporter, if you could

4   please make sure you let me finish my question?

5   A.  I'm sorry.

6   Q.  No problem.

7       I believe your answer to that question was, yes?

8   A.  Yes.

9           MR. LORFING:  Your Honor, at this time I move Exhibit

10  10 into evidence?

11          MR. BLIZZARD:  No objection.

12          THE COURT:  Exhibit 10 is admitted.

13  BY MR. LORFING:

14  Q.  Ma'am, the next few questions I'm going to ask is

15  regarding the trailer at 124 PR, 5503.

16      Did you have a key to that trailer?

17  A.  I do.

18  Q.  Do you have the key with you today?

19  A.  I do.

20  Q.  Can you show the Court this key?

21  A.  (Indicating)

22          THE COURT:  Is that where you keep it?

23          THE WITNESS:  It is.

24          THE COURT:  You don't keep it at home?

25          THE WITNESS:  No.  It's on my key ring at all

53

1  times.

2  BY MR. LORFING:

3  Q.  It looks like you've had that key ring for awhile.  How

4  long have you had that key on your key ring?

5  A.  Since 2011.

6  Q.  Was that the key that you used to unlock the door of the

7  trailer the day Agent Noack searched the trailer?

8  A.  It is.

9  Q.  Now, you've been in that trailer before, correct?

10  A.  Yes.

11  Q.  In fact, you've probably been in that trailer many times,

12  right?

13  A.  Yes.

14          THE COURT:  Did you ever live there?

15          THE WITNESS:  No.  Ever since we bought it, nobody's

16  lived in it.  It was used for, I don't know, an extra trailer

17  for my husband's kids so maybe they could come down and use it

18  for the weekend to go fishing.  We were using it, basically,

19  as a back-up house because my home needs a lot of work on it,

20  the one I'm living in.  There was going to be a possibility

21  that we may have to live in that one.  I bought it from my

22  mother.  So nobody's lived in it since.

23  BY MR. LORFING:

24  Q.  Ma'am, prior to January of 2019, had anyone ever lived in

25  that property?

54

1    A.   Okay.  I'm sorry.  Repeat that?

2    Q.   Prior to January 2019, had anyone lived in that

3    property?

4    A.   Yes.

5    Q.   Okay.  Did you and your husband primarily use that trailer

6    for storage?

7    A.   We did.

8    Q.   Now, did you ever tell your son, Christopher Regan, that

9    he could stay in that trailer?

10   A.   I did.

11   Q.   Was the point of this to provide him a place to stay, lay

12   his head, if he needed it?

13   A.   It was to be for him and his children.

14   Q.   To your knowledge, was Christopher Regan sleeping in that

15   trailer every night during the months of January and February

16   2019?

17   A.   I don't believe he was, no.

18   Q.   And why do you believe he wasn't staying there every

19   night?

20   A.   Because he wouldn't be there.  His vehicle wouldn't be

21   there some nights and some nights it would be.  Plus, he told

22   me he was staying elsewhere some nights.

23          THE COURT:  Ms. Wilkins, we have been told either in

24   testimony or in the papers that your son never slept there?

25          THE WITNESS:  No, that's not true.  He has slept

U.S. DISTRICT COURT

55

1    there.  He did.  I can't tell you how many times.  He slept

2    elsewhere more often than he slept there.  He may have slept

3    there two nights a week if that much, but he did sleep

4    there.

5            THE COURT:  So you would guess the max that he slept

6    there was two nights a week?

7            THE WITNESS:  I would say two to three.

8    BY MR. LORFING:

9    Q.  Now, you mention the reason you knew he wasn't staying

10   there is, one, because his car wasn't there?

11   A.  Yes.

12   Q.  Two, because he told you that he was staying elsewhere?

13   A.  Yes.

14   Q.  Where did he tell you that he would stay?

15   A.  With a friend that he had gone to school with years ago

16   that lived in Emory (phonetic).

17   Q.  But you knew that not to be true, correct?

18           MR. BLIZZARD:  Objection, leading.

19   BY MR. LORFING:

20   Q.  Did you know it wasn't true?

21   A.  I didn't know for sure, but I suspected it was not.

22   Q.  Did you ever do anything to confirm your suspicions that

23   he wasn't living with a friend?

24   A.  I did.

25   Q.  What did you do?

56

1        MR. BLIZZARD:  Your Honor, I'm going to object to

2   relevance.  I don't see how it's relevant to consent.

3        THE COURT:  Can you tell us how that's relevant?

4        MR. LORFING:  Certainly, Your Honor.

5     Your Honor, there has been a representation that this

6   property belongs to Mr. Regan, that he stayed there on a

7   regular basis.  The government offers this testimony to

8   establish that, not only did he not own the property, that he

9   wasn't staying there.  I think that would go to his

10  expectation of privacy on the property.

11       THE COURT:  But the question that we're concerned

12  with right now is whether he had lied and he wasn't actually

13  staying with a friend.  I don't see what's the relevance of

14  that?

15       MR. LORFING:  Your Honor, the government believes the

16  testimony will be that Ms. Wilkins actually drove over to his

17  wife's residence and saw Mr. Regan staying at that

18  residence.

19       THE COURT:  All right.  Go ahead.

20     Objection overruled.

21  BY MR. LORFING:

22  Q.  Ms. Wilkins, to your knowledge, was -- did your son ever

23  stay somewhere other than your trailer or his friend's house

24  in Emory?

25  A.  Yes.

57

1   Q.  And where was that?

2   A.  That would have been at his mother-in-law's where Tanya

3   was living.

4   Q.  And how do you know that?

5   A.  Because my husband and I drove by there one night.  I was

6   trying to make sure that he wasn't with her, and my suspicion

7   was right that he was.

8   Q.  And you know that.  Did you see Chris there?

9   A.  I saw his vehicle.

10  Q.  Now, this would have been after Tanya had been arrested

11  for the sexual assault on her children?

12  A.  Yes.

13  Q.  Still talking about the trailer in question, did your

14  trailer have a stove in it during the duration of the time

15  Christopher Regan supposedly stayed there?

16  A.  It did not.

17  Q.  Did your trailer have hot water during the duration of the

18  time Christopher Regan was staying there?

19  A.  No, it did not.

20  Q.  Do you know where Chris Regan would shower?

21  A.  At my house when he was there.

22  Q.  How many times would you say Mr. Regan showered at your

23  house during the months of January and February of 2019?

24  A.  Maybe four or five.

25  Q.  Would he shower at the trailer the other times?

58

1    A.  No.

2    Q.  How do you know that?

3    A.  Well, I suspected he didn't because I had nothing but cold

4    water, and it was winter.  So ...

5    Q.  Prior to you allowing Chris to use the trailer, were there

6    locks on the bedroom doors?

7    A.  No, no.

8    Q.  Was there a lock on the front door of that trailer?

9    A.  Yes.

10   Q.  After Chris started using this trailer, did he change the

11   lock on the front door?

12   A.  No, he did not.

13   Q.  Did he add locks to the bedroom doors?

14   A.  No, he did not.

15   Q.  Now, is there also a storage shed on your property?

16   A.  Yes, there is.

17   Q.  After Chris started using your trailer, did he also use

18   the storage shed?

19   A.  I'm sorry.

20   Q.  Ms. Wilkins, you're doing a great job.  If you need to

21   take a moment, please do so.  I know this is difficult.

22   A.  I'm sorry.  What's the question again?

23   Q.  After Chris started using your trailer, did he also use

24   your storage shed?

25   A.  He did.

59

1   Q.  Look at me, Ms. Wilkins.  You can do this.

2       You testified that he started using the storage shed.  Did

3   he add a lock to the storage shed?

4   A.  Yes.

5   Q.  So is it your testimony that he added a lock to the

6   storage shed, but he never added locks anywhere in the

7   trailer?

8   A.  Yes, that's it.

9   Q.  During -- what time period was Chris Regan supposedly

10  staying in your trailer?

11  A.  I believe in January.  It was after Christmas --

12          THE COURT:  Before you go on, I want to ask a

13  question about the storage shed.

14          THE WITNESS:  Yes.

15          THE COURT:  Did you also have a key to the storage

16  shed?

17          THE WITNESS:  No.  It had no lock on it before he

18  moved in because it was really never used.

19          THE COURT:  On March 1, 2019, when you assisted in

20  the retrieval of items from the structure at 124, were any

21  items taken from the storage shed?

22          THE WITNESS:  I don't think so.  I really don't

23  remember.  I don't think there was anything in there to

24  take.

25          THE COURT:  Okay.  Thank you.

60

BY MR. LORFING:

Q.  Ma'am, you testified it was some time after Christmas up until the time he was arrested?

A.  Yes.

Q.  That would have been on or about February 13?

A.  Yes.

Q.  During that time period, sometime after Christmas, up until February 13, did you ever go into that trailer?

A.  Yes.

Q.  Would you ask permission from Chris before you entered the trailer?

A.  No.

Q.  Would you knock on the door every time before you opened it?

A.  No.

Q.  If Chris told you you couldn't enter the trailer, what would you have told him?

A.  Well, he wouldn't have ever said that.  I would have gone in anyways, but he would have never said that.

Q.  And why would he have never said that?

A.  Because he knows it's my trailer.  He knew it was my trailer.  That's it.

Q.  Did you ever enter the trailer without his permission?

A.  Yes.

Q.  Did you even feel like you needed to ask him permission?

61

1    A.   No.

2    Q.   Now, would Chris ever be home when you entered his

3    house?

4    A.   Sometimes, yes; sometimes, no.

5    Q.   What would he do if he saw you walk in the trailer without

6    knocking?

7    A.   Nothing.  He would usually be sitting in the couch.

8    Q.   Can you give the Court an example of when you would walk

9    into his house?

10   A.   Like what would he do you mean?

11   Q.   What would you do when you walked in?

12   A.   Well, I would just walk in and say, hey, you know, what

13   are you doing?  How are you doing?  He would be on the couch

14   sometimes watching TV.  I don't think he was ever in the

15   bedroom when I would walk over there because, usually, he was

16   on the couch.  I think that's kind of where he sat most of the

17   time.  It's pretty much the only place to sit.

18   Q.   You mentioned that you were responsible for the utilities,

19   correct?

20   A.   Yes.

21   Q.   Did you ever exercise any authority over that building to

22   turn off lights or electricity?

23   A.   No.

24   Q.   Did you do that?  Did you ever go into his house and turn

25   off lights?

62

1    A.  Oh, I'm sorry.  I misunderstood.  I thought you was

2    talking about having the power cut off to the house.  I'm

3    sorry.

4    Q.  No problem.

5    A.  No.  I would -- when I knew he had been gone a day or

6    more, I would go in the house, turn off lights, turn off

7    heaters.

8    Q.  Okay.

9    A.  The air conditioner in the bedroom sometimes, to keep my

10   electric bill down.

11   Q.  Now, would you do that in secret or would you tell Chris

12   after the fact that you turned that stuff off?

13   A.  Sometimes I would tell him, but sometimes he would just go

14   home and know it, but I would let him know, you know, it's

15   going to be cold when you get home.

16   Q.  But when you told him that you entered this property, your

17   trailer, and turned off all the stuff, did he tell you, don't

18   do that.  That's my place?

19   A.  No.  He'd say, okay.

20   Q.  Was there any indication from your son that you did not

21   have control and couldn't enter that trailer at will?

22   A.  No.

23   Q.  If you wanted to walk into his house and open his

24   refrigerator and take out milk, could you have done that?

25   A.  Yes.

63

1   Q.  If you wanted to walk into his bedroom and take a pillow,

2   could you have done that?

3   A.  Yes.

4   Q.  If you wanted to open up his sock drawer and take out some

5   socks for your husband, Phillip, could you do that?

6   A.  Yes.

7   Q.  Have you spoken to Chris Regan frequently since he was

8   incarcerated?

9   A.  I have.

10  Q.  Do you recall a conversation with Chris on or about

11  February 20, 22, where you talked about the destruction -- or

12  where you discussed the destruction of evidence?

13  A.  Yes.

14  Q.  What did he tell you?

15  A.  He told me that he had been thinking about -- wondering

16  about some things that -- he was trying to think maybe there

17  had been things he had missed, you know, clues or something

18  going on when he and his family were all living together.  You

19  know, what did he miss?  You know, what could he have seen

20  that maybe this was going on?  He missed it, you know.  He was

21  racking his brain about it.

22      He thought about the fact that he said, you know, I

23  remember Tanya gave me SIM cards, and he said -- thinking

24  about it, he said, I really don't know why she did it.  He

25  said, I'm thinking she might be trying to set me up, and --

64

1    Q.  Let me stop you right there.

2         During that conversation, did he ask you or suggest that

3    SIM cards should be burned?

4    A.  He did.

5    Q.  Do you recall listening to that conversation with me?

6    A.  I do.

7    Q.  We had to get some headphones to make sure you could

8    listen to it?

9    A.  Yes.

10   Q.  We also had a transcript available for you?

11   A.  Yes.

12   Q.  If you could turn to Exhibit 5 in that book.

13        Your Honor, I direct the Court to Exhibit 5.  It's the

14   transcript of this call.

15             THE COURT:  I'm sorry.  I didn't hear you.  What was

16   the last part you said?

17             MR. LORFING:  Your Honor, I was just directing the

18   Court to Exhibit 5, which is the transcript of the call in

19   question.

20             THE COURT:  Okay.  I was making a note.  This call is

21   what and when?

22             MR. LORFING:  Your Honor, it was a jail call between

23   this witness and the defendant.

24             THE COURT:  Okay.

25   BY MR. LORFING:

1    Q.  If you could just briefly look through that transcript and

2    look up at me when you have had a chance to recognize it?

3    A.  Okay.

4    Q.  Now, I want you to keep that open.

5    A.  Okay.

6    Q.  I want to talk to you about the call.

7        Do you recall that we played this audiotape for you.

8    A.  Yes.

9    Q.  Did it appear to be altered in any way?

10   A.  No, it did not.

11   Q.  Did you recognize the voices on that call?

12   A.  I did.

13   Q.  Was your voice on that call?

14   A.  It was.

15   Q.  And who else's voice was on that call?

16   A.  My son.

17          MR. LORFING:  Your Honor, at this time I would move

18   Exhibit 4 into evidence.

19          MR. BLIZZARD:  No objection.

20          THE COURT:  You said 4?  I thought you said 5

21   earlier?

22          MR. BLIZZARD:  Your Honor, that's the transcript.

23   I'll move that into evidence in a moment.  Right now it's just

24   Exhibit 4.

25          THE COURT:  I understand.  Exhibit 4 is admitted.

1        MR. LORFING:  Your Honor, this is approximately a two

2   minute clip.  I'm going to ask to play it in its entirety.

3   BY MR. LORFING:

4   Q.  Ms. Regan (sic), if you could look along at Exhibit 5 and

5   the transcript as this call is played?

6   A.  Ms. Wilkins.

7        THE COURT:  You didn't offer 5?

8        MR. LORFING:  Yes, Your Honor.  At this time I would

9   move to admit Exhibit 5 into evidence.

10       MR. BLIZZARD:  No objection.

11       THE COURT:  Admitted.

12    (Recording played at this time)

13   BY MR. LORFING:

14   Q.  Ms. Wilkins, did your son ask you or suggest you should

15   burn some cards?

16   A.  He did.  He did.

17   Q.  Did he tell you where you could find those cards?

18   A.  Yes, he did.

19   Q.  Did you find those cards where he said they would be?

20   A.  I did.

21   Q.  What was your immediate thought when you actually saw that

22   those were not like greeting cards but SIM cards or SD

23   cards?

24   A.  I knew it wasn't right --

25       THE COURT:  You knew what?

1          THE WITNESS:  I knew it wasn't right.  I was looking

2     for cards, greeting cards that you would write, like letters

3     that she had wrote him.  When I saw that those were SIM cards,

4     I was like, this ain't right.  There's something wrong here.

5     BY MR. LORFING:

6     Q.  Did you have a concern about what would be in those

7     cards?

8     A.  Oh, yeah, immediately.

9     Q.  What was that concern, Ms. Wilkins?

10    A.  That she had possibly given him SIM cards that had abuse

11    of my grandchildren.

12    Q.  Is one of your grandchildren in the courtroom today?

13    A.  He is.

14    Q.  Did you burn those cards like he had asked you to?

15    A.  Absolutely not.

16    Q.  What did you do with them then?

17    A.  I left them there.

18    Q.  And did you at any point ever call the police -- I'm

19    sorry.  Let me stop you.  Let me ask a question.

20        Why didn't you call the police immediately?

21    A.  Well, because Chris's brother, Matthew, had told me once

22    he was arrested to be prepared that the police are probably

23    going to be coming and searching your house.  And I said,

24    okay, just let me know and I'll let them in.

25        A whole week went by and nothing happened.  Two weeks went

68

1   by and nothing happened, and I thought, well, wait a minute.

2   I need to tell Matthew, what do I need to do with this stuff.

3   If there's evidence on it, they need it, you know.  It didn't

4   seem like nobody was going to come search it, and I needed

5   that out of my house, and it needed to go to the authorities

6   to see what was on it.

7   Q.  So your expectation was that a search was imminent, that

8   cops were coming to search the place?

9   A.  Oh, yeah.  Oh, yeah.

10  Q.  And when that didn't happen, did you take matters into

11  your own hands?

12  A.  I did.

13  Q.  Who did you reach out to?

14  A.  I reached out to Matthew, and Matthew reached out to Agent

15  O'Leary, and then --

16  Q.  Let me stop you.  The Matthew you're referring to is

17  Chris's brother?

18  A.  Chris's brother.  He's a police officer.

19  Q.  And Matthew is employed as a police officer?

20  A.  Yes, he is.

21  Q.  And it's your understanding Matthew then reached out to

22  the case agent in this case, Marisol O'Leary?

23  A.  He did, yes.

24  Q.  At any point did you speak to the case agent, Marisol

25  O'Leary?

69

1    A.  I did.

2    Q.  And what did you tell her?

3    A.  I just told her what the phone conversation was, and then

4    I -- you know, I believed that Chris was innocent.  I didn't

5    want -- you know, I didn't know what was on there, and I

6    didn't know -- I was afraid that he was going to get blamed

7    for it.  But, there again, I didn't know if it was really his

8    or if it was Tanya's.  I just wanted it out of my house, and

9    if it was evidence, I wanted it taken.

10   Q.  So is it your testimony that you told Agent O'Leary about

11   the call where Chris had told you to burn these things?

12   A.  I did.

13   Q.  And did you tell her to come get them?

14   A.  I did.

15   Q.  And did she ask for consent at that time?

16   A.  She asked if she could send two agents down to come get

17   those items.

18   Q.  And what did you say?

19   A.  I said, okay, yes.

20   Q.  Now, did you ask Chris, your son, if the police could

21   search the trailer?

22   A.  I did not.

23   Q.  Did you tell Chris that the police were coming to search

24   the trailer at any point?

25   A.  I think I told him like after Matthew told me, you know,

70

1    that, hey, they were going to be coming and searching.  That's

2    when I told him that they were going to be coming and

3    searching, not when I made the call, but, you know, right

4    after he was arrested, Matthew said, hey, they're going to

5    come.  I just let him know they were going to be coming.

6    Q.  Well, when you told your son that cops were coming to

7    search that place?

8    A.  Yes.

9    Q.  Did he ever comply or suggest that you should not give

10   consent?

11   A.  No.

12   Q.  Did he tell you that cops aren't allowed into my place?

13   A.  No.

14   Q.  Did he tell you that there is no way that he's going to

15   allow cops to search without a search warrant?

16   A.  No.

17   Q.  In fact, he tells you it's up to you whether or not --

18   only you can allow them to search, right?

19   A.  Yes, that's it.

20   Q.  Now, ultimately, two law enforcement officers showed up.

21   Is that your understanding?

22   A.  Yes.

23   Q.  One of those folks that showed up, was he on the stand

24   earlier?

25   A.  He was.

1   Q.   Did you recognize Agent Noack?

2   A.   I did.

3   Q.   Now, did Agent Noack threaten or intimidate you in any way

4   into allowing the search of that trailer?

5   A.   No, he didn't.

6   Q.   In fact, you're the one that called law enforcement and

7   asked them to come do a search?

8   A.   I did.

9   Q.   Did you willing and voluntarily sign a consent form

10  allowing Agent Noack and his partner to search the trailer?

11  A.   I did.

12  Q.   If you can turn to Exhibit 1 in your notebook, it's

13  previously been admitted.

14      Is this the form that you signed giving agents consent?

15  A.   It is.

16  Q.   Did you -- now, after -- during this discussion with Agent

17  Noack -- I'm sorry.  Let me rephrase.

18      Prior to entering the trailer to do the search, did you

19  speak with Agent Noack for several minutes?

20  A.   I did.

21  Q.   During this conversation, did you tell him that the

22  trailer belonged to you?

23  A.   I did.

24  Q.   Did you tell him that you had access to the trailer?

25  A.   I did.

72

1   Q.  Did you make it clear that you could go in and out of that

2   trailer as you pleased?

3   A.  Yes.

4   Q.  Did you have a key to that place?

5   A.  I did.

6   Q.  Was it clear to Agent Noack that you had a key to that

7   place?

8   A.  Yes.

9   Q.  What else did you tell him during this conversation?

10  A.  I don't know.  I was rambling a lot.  I was very upset,

11  heartbroken.

12  Q.  Did you ever specifically tell him to search the entire

13  trailer?

14  A.  I did.  He came to pick up, I believe, the two items.  I'm

15  not sure.  It was my understanding that that was all he was

16  coming for, and I told him I want this whole place searched.

17  Q.  And why did you say that, ma'am?

18  A.  Because I didn't know what else might be in there, and I

19  wanted everything out that had anything to do with the abuse

20  of my grandchildren.

21  Q.  Did you want Agent Noack and his partner to leave without

22  searching the entire trailer?

23  A.  No.

24  Q.  Ma'am, before I sit down, I do want to bring it up because

25  I think it's fair for the Court and opposing counsel to hear

73

1    this.  You have previously been convicted of a crime.  Is that

2    correct?

3    A.  Yes, I have.

4    Q.  That's felony possession or distribution of drugs?

5    A.  Yes.  It was possession of a controlled substance.

6    Q.  And you were ultimately revoked and spent some time in

7    prison, correct?

8    A.  I did.

9    Q.  You pled guilty to that?

10   A.  I did.

11   Q.  Why did you plead guilty to that?

12   A.  Because I was guilty.

13   Q.  That was in approximately 2009?

14   A.  It was.

15   Q.  Can you tell this Court when was the last time you used

16   drugs?  I want to remind you you're under oath.

17   A.  Illegal drugs?

18   Q.  I'm sorry, contraband, illegal drugs.

19   A.  2009.

20   Q.  Are you under any medication or substance that would

21   inhibit your ability to testify truthfully here today?

22   A.  No.

23   Q.  Have you answered all of my questions truthfully and to

24   the best of your ability?

25   A.  I have.

74

1   Q.  Ms. Wilkins, I know this has been difficult.  Thank you

2   very much.

3       I pass the witness.

4           THE COURT:  Cross examination.

5           MR. BLIZZARD:  Thank you, Your Honor.

6                     **CROSS EXAMINATION**

7   BY MR. BLIZZARD:

8   Q.  Ms. Wilkins, the trailer in question, throughout many of

9   the conversations you had with Chris on the jail calls, he

10  frequently refers to it as my house, right?

11  A.  Yes.

12  Q.  And you don't say anything about disputing that, do you?

13  A.  No.

14  Q.  Because it was his house to live in, to stay in, if he

15  wanted to, to take the children to, that kind of thing,

16  right?

17  A.  Well, it was for him to stay in.  It was to be a temporary

18  solution.

19  Q.  Sure.

20  A.  So that he could get the children.

21  Q.  Have you ever had any rental property, ma'am?

22  A.  Any what?  I'm sorry.

23  Q.  Rental property, had any rental property?

24  A.  No.

25  Q.  Are you aware that, if you allow somebody to stay in a

1    place, rent, no rent, whatever, you can't just kick him out?

2    Are you aware of that?

3    A.   No, but he's my son.  I wouldn't have kicked him out.

4    Q.   Right.  You would have to go through a formal eviction

5    process to remove somebody you didn't want to stay in a place

6    you allowed them to live?

7    A.   Okay.  I don't know that, but okay.

8    Q.   How many times have you talked with agents from the

9    government or the U.S. Attorney's Office in this case?

10   A.   I can't give you an exact number.

11   Q.   More than ten?

12   A.   I've been kind of out of my mind ever since he was

13   arrested.  It's heartbreaking.

14   Q.   Is it more than ten?

15   A.   No.  It wasn't that many.

16   Q.   How many would you say?

17   A.   I would say, I don't know, four or five is the best I can

18   recall, if that many.

19   Q.   Okay.  So who talked to you about this idea of a right of

20   privacy?  That was the first question Mr. Lorfing asked you --

21   A.   Yes.

22   Q.   -- is if you believe Chris had a right of privacy in that

23   trailer.  Who talked to you about what that means?

24   A.   Who spoke to me and told me about what that is you mean?

25   Q.   Uh-huh.

1    A.  Mr. Russell.  I don't know how to say his last name.

2    Q.  Lorfing?  Mr. Lorfing?

3    A.  Okay.

4    Q.  So what did he explain to you about what the right of

5    privacy is?

6    A.  He just told me that a right of privacy is that you have a

7    place that you might live that you have the right to -- just

8    because you're there, you have that right and that gives you

9    privacy automatically is the way I took it.

10   Q.  Okay.  So let me ask you this.  Do you think that

11   Mr. Regan had the right to exclude other people besides you

12   from that trailer?

13   A.  To exclude other people besides me?

14   Q.  Yes.

15   A.  I guess if somebody came over.

16   Q.  Well, like say he's watching TV at night sitting on the

17   couch?

18   A.  Yeah.

19   Q.  Someone comes up to the door and they want to come in.  Do

20   you think he has the right to tell them to go away?

21   A.  Well, yeah, he wouldn't call and ask me if they could come

22   in or not if it was somebody he wanted to see.

23   Q.  Do you think if Mr. Regan was there in the residence and

24   you came over, and you said, hey, you know, I want to talk to

25   you for a minute, and he said, nah, Mom, I don't want to talk

1    to you right now.  I want to watch TV, or I have a headache.

2    I want to lay down.  Do you think you would respect his

3    decision and you would go away?

4    A.  It would depend on what it was I wanted to talk to him

5    about.  No, if I had something to say and I needed to talk to

6    him about it, I'd do it anyways.

7    Q.  Okay.  So you would just barge in and you would just be

8    there.  Is that your position?

9    A.  Yeah, I guess you could say that, if that's what you want

10   to say.

11   Q.  All right.  Now, you say you've been in the residence a

12   number of times and used the key.  Where would you go when you

13   would go in the residence, 124?

14   A.  Well, I would walk through the door.  It's a very small

15   place, you know.  You can walk in the front door and you can

16   see all the way back to the bedroom, but I would walk in.

17   Sometimes I would go back to the bedroom to see if he had

18   stayed the night.

19   Q.  Okay.

20   A.  I would walk into the living room and turn off the lights,

21   the heaters is usually where that was in the living room, and

22   just walk through the whole house and make sure everything was

23   turned off and everything was okay.

24   Q.  All right.  So besides checking on the place, when Chris

25   was gone and in jail, would you still walk all over the whole

78

1    residence, or would you just kind of come in and look in every

2    now and then, or what?

3    A.  No, because nobody was there.

4    Q.  So when you would come over to the residence, when Chris

5    was in jail, where would you go?

6    A.  I don't really know.

7    Q.  What would be your purpose of going over there?

8    A.  I have no idea.  There would be several purposes, but I

9    can't tell what they would be.

10   Q.  You went over there a couple of times to drink tequila,

11   right?

12   A.  If that's what it said, yes.

13   Q.  Well, I mean, I think you said in the jail calls?

14   A.  Probably, yes.

15   Q.  Do you recall going over there for any other purpose

16   besides that?

17          MR. LORFING:  Your Honor, I'm going to object, asked

18   and answered.  She's answered this on this cross examination,

19   going to turn off the heater, going into the bedroom, turning

20   off the air conditioner.

21          THE COURT:  Can you conclude quickly?

22          MR. BLIZZARD:  Yes, sir.

23   BY MR. BLIZZARD:

24   Q.  When Chris was in jail besides going to drink tea kill

25   would you go in there for any other purposes?

```
1    A.   Yes.

2    Q.   What were those purposes?

3    A.   Sometimes to just sit on the couch and cry.

4    Q.   Just to be alone?

5    A.   Yes.

6    Q.   Would you agree with me, ma'am, that you didn't go back

7    into the bedroom?

8    A.   Do what?

9    Q.   Do you agree that you did not go back into the bedroom?

10   A.   No, I don't agree to that.  I was all over the house.

11   Q.   Okay.

12        THE COURT:  Ms. Wilkins, I'm inferring from what you

13   just said about that was a good place to go and cry, that that

14   was a place where you sought privacy.  Is that fair to say?

15        THE WITNESS:  I wanted to be where he had been.  I

16   wanted to sit where he had sat.

17        THE COURT:  Once you recover yourself, tell me why

18   you wanted to sit where he had sat.

19        THE WITNESS:  Because he was gone, and I love my son,

20   and I was afraid I wasn't going to get to see him again.

21        THE COURT:  Okay.

22   BY MR. BLIZZARD:

23   Q.   Ms. Wilkins, just tell me when you're ready to proceed.

24   A.   I'm ready.

25   Q.   Did you have an agreement with Chris that he could stay
```

80

1    there and he would fix up the place?

2    A.   That he could stay there if he would fix up the place?

3    Q.   Uh-huh.

4    A.   You mean like an exchange for rent or something like that?

5    Q.   Well, I mean, he could stay there and he would fix up the

6    place as a part of staying there?

7    A.   No -- well, no, that wasn't the deal.  I fixed up the

8    place.  I got the plumbers out there.

9    Q.   Okay.  So the mailbox, he put up a mailbox, right?

10   A.   My brother did.

11   Q.   He did it with your brother, didn't he?

12   A.   No, I don't think so.  He may have.  I really don't

13   remember, but my brother is the one that --

14   Q.   The mailbox was for Chris, right?

15   A.   Yes.

16   Q.   It had Regan on it indicating he lived at that residence,

17   right?

18   A.   Yes.

19   Q.   He did, in fact, make repairs?

20   A.   I'm sorry.  What did you say?

21   Q.   Chris did, in fact, make repairs, correct?

22   A.   Yes, he did.

23   Q.   Do you remember him installing a pole?

24   A.   Yes.

25   Q.   Putting in a TV antenna?

81

1   A.  He did.

2   Q.  Putting in some sidewalk-type bricks on the outside?

3   A.  He did, yes.

4   Q.  Putting some stairs up to the back door?

5   A.  He did.

6   Q.  He worked on a wall in the interior?

7   A.  Yes, I believe he did, yes.

8   Q.  Okay.

9          THE COURT:  I have a question for you.

10     You mentioned earlier that you felt at liberty to barge in

11  and go in any time you wanted to.

12         THE WITNESS:  Yes, sir.

13         THE COURT:  Is that correct?

14         THE WITNESS:  It is.

15         THE COURT:  If when you barged in and he had said to

16  you, Mom, I really wish you wouldn't do that.  I don't want

17  you to come barging in anymore.  I want you to knock before

18  you come in and treat this as my place, what would you have

19  said?

20         THE WITNESS:  I would have probably laughed.  He

21  would never have said that.  He wouldn't have ever said that,

22  but if he had, we probably would have words about it because

23  that would not be the case.  It's my home.  I can go in there

24  any time I want, but he would never have said that to me

25  ever.

82

1          THE COURT:  All right.

2     BY MR. BLIZZARD:

3     Q.  Ma'am, do you have that notebook in front of you with the

4     hearing exhibits?  One of the exhibits that's been entered

5     into evidence is Government's Exhibit 10, right?

6     A.  Yes.

7     Q.  Those are the electric bills for both 120 and 124 Private

8     Road, right?

9     A.  Yes, they are.

10    Q.  In looking at these bills, looking at 124 Private Road,

11    would you agree with me that there is a substantial meter read

12    that is even more than the 120 Private Road?

13    A.  Is there a certain one you're referring to?

14    Q.  Sure, if you will look at the third page and the fourth

15    page?

16    A.  The third page is where I live.

17    Q.  The third page is where you live.  It's for the same

18    period of time, right?

19    A.  Yes, and the second one is his, which is the 142.

20    Q.  Right.  So his is a little bit less but still as if

21    somebody lives there, right?

22    A.  Yes.

23    Q.  And this is for the period of, I guess, what is going to

24    account for January.  Is that right?  Is that your

25    understanding of this bill?

83

1    A.   Let me see.

2    Q.   Total as of 1-30-2019 is what it says at the bottom?

3    A.   Yes, I see that.  Okay, yeah.

4    Q.   So this is in January, he has a bill that's almost as much

5    as your bill?

6    A.   Yeah, we do.  That's due to the heaters being left on, and

7    that's how I knew I had to start going and turning those

8    things off.

9    Q.   There were some questions asked to you by Mr. Lorfing

10   about this idea that the only way that the police or law

11   enforcement are going to get into the trailer where Chris had

12   resided in was if you let them.  Do you recall that

13   questioning, about a jail call?

14   A.   I guess.  I'm not exactly sure what you're asking me.

15   Q.   Sure.  I'll give you a little background here.

16        There was a jail call between you and Chris, and you may

17   have heard it earlier played where he says the only way the

18   police are going to get in there is if you let them.

19   A.   Yes, I do remember that call.

20   Q.   And would you agree with me by Chris's demeanor in that

21   call, he's not wanting the police to come in and search that

22   residence?

23   A.   Probably.  I'm not sure exactly.  He was just letting me

24   know because I don't know a lot about that.  The only way they

25   could get in there is if I let them.  I can't tell what his

84

1    demeanor was, what it sounded like.

2    Q.  Okay.  But aren't you pretty certain that when you granted

3    consent for Agent Noack to search that residence, that's not

4    something that Chris wanted, is it?

5           MR. LORFING:  Your Honor, I'm going to object to

6    speculation.  Essentially, asked and answered as well.

7           THE COURT:  Overruled.  You may answer.

8    A.  Well, what he told me to get rid of, probably not.

9    BY MR. BLIZZARD:

10   Q.  Okay.  So the answer is, no, he didn't want that search to

11   take place?

12   A.  Well, I don't know for sure.  I would be guessing.  I

13   would say, probably not.  He didn't say, no.  I can't know

14   what he's thinking, to be honest.

15   Q.  I want to talk to you for a minute about another topic

16   here.

17       One of the things that you produced to Agent Noack after

18   the fact was a backpack and some papers.  Do you recall that?

19   A.  Yes, I do.

20   Q.  And these items were Chris's backpack?

21   A.  Yes, they were.

22   Q.  They were not in the trailer?

23   A.  No, they were not.

24   Q.  They were left in your truck?

25   A.  They were.

85

1   Q.  And Chris had driven that truck, right?

2   A.  Yes.

3   Q.  And he had left the backpack in the truck?

4   A.  Yes.

5   Q.  And you came and just produced it to Agent Noack, gave it

6   to him and said, take this, too, pretty much?

7   A.  I told him to take this and search it because I had not

8   opened it.  I just took it out of the truck in my home, just

9   to get it out of the truck.  I didn't know what was in it and

10  I wanted it searched.

11  Q.  It wasn't your backpack?

12  A.  It was not.

13  Q.  You didn't share ownership of that backpack, did you?

14  A.  Well, it was in my vehicle, so ...

15  Q.  I understand that, ma'am, but did you share ownership of

16  the backpack or not?

17  A.  No, I did not.

18  Q.  So did you -- all right.  Ma'am, you said that you

19  believed that Mr. Regan was staying at a residence with Miss

20  Peoples and Tanya Regan.  Is that right?

21  A.  Yes.

22  Q.  And you believed that because you drove by and you saw his

23  vehicle there on one occasion, correct?

24  A.  That's true.

25  Q.  Is that the only time you saw that he was over there?

86

1    A.   That's the only time I drove by to see, yes.

2    Q.   And would you agree with me that he did not have the

3    ability to, like you said, take a shower at that trailer?

4    A.   No, he couldn't -- I mean --

5    Q.   He could take a cold shower?

6    A.   There was no hot water in that trailer.

7    Q.   And he and Leta Peoples have a long-standing relationship,

8    right?  I mean, they have known each other for years?

9    A.   Oh, yes.

10   Q.   It's Tanya's mother, right?

11   A.   Yes.

12   Q.   And it wouldn't be surprising that he would associate with

13   her in some regard, is it?

14   A.   No, it's not.

15   Q.   Ma'am, prior to Mr. Regan telling you to go get those

16   cards and you going and opening that dresser drawer and

17   getting those cards or seeing the cards, did you ever look in

18   that drawer previously?

19   A.   No.

20   Q.   Had you ever gone through any of those drawers of that

21   dresser?

22   A.   No, I wouldn't think so.  There wouldn't be no reason for

23   me to.

24   Q.   Contained within that drawer are things like socks and

25   underwear, right?

1    A.  Yes.

2    Q.  And prescriptions?

3    A.  I don't remember that.

4    Q.  Nevertheless, you don't exactly want everybody to see your

5    underwear, right, all the time?

6    A.  I don't want them to see mine, no.

7    Q.  So you would understand that a person would want to keep

8    their underwear drawer private, correct

9    A.  Yeah, but --

10   Q.  Just "yes" or "no"?

11   A.  Yes.

12   Q.  And you understand that when Chris told you to go get the

13   cards and burn them or whatever, he wanted you alone to take

14   action, right?  He didn't want you to call the government.

15   You to get somebody else to do anything.  He wanted you to go

16   into his trailer?

17   A.  Yes, he did.

18   Q.  For a limited purpose of doing what he asked you to do,

19   right?

20   A.  Yes, I guess so.

21       Can I say something?

22   Q.  No, ma'am.  It's a question and answer format here.

23       Would you turn to what's been put in the government's book

24   as Number 2 tab?

25   A.  Okay.

1    Q.  And you -- have you been -- you've been in this trailer

2    and you've looked at these photographs -- or excuse me.  Look

3    at these photographs now, if you would.  Have you looked

4    through all those?

5    A.  No, I have not.

6    Q.  Okay.  Look through all of them for me, please.

7         (Brief pause in proceedings)

8    Q.  Have you had a chance to look through all those?

9    A.  Excuse me?

10   Q.  Have you had a chance to look through all those?

11   A.  No.  This is the first time I've seen them.

12   Q.  Okay.  You can go on.

13        (Brief pause in proceedings)

14            THE COURT:  We're going to need to take a lunch break

15   fairly soon.  Will you be finished with your questioning?

16            MR. BLIZZARD:  Yes, sir, I will.

17            THE COURT:  I'm not rushing you.  I'm just asking.

18            MR. BLIZZARD:  Once I get through these photos is

19   when I'm going to wrap it up.

20            THE COURT:  Will you have redirect?

21            MR. LORFING:  Yes, Your Honor.

22            THE COURT:  Brief, you think?

23            MR. LORFING:  I think very brief.

24            THE COURT:  Okay.  So how long do you think it will

25   take you to go through --

89

1          MR. BLIZZARD:  Not very long, Your Honor, five

2    minutes.

3          THE COURT:  Okay.  Go ahead.

4    BY MR. BLIZZARD:

5    Q.  Have you had a chance to look at those photos?

6    A.  Yes.

7    Q.  Are those photos of 124 Private Road, 5503?

8    A.  They are.

9    Q.  And are they a fair and accurate depiction of the

10   exterior/interior and some of the items recovered from the

11   residence?

12   A.  They are.

13   Q.  Do they appear to be altered in any way?

14   A.  No.

15   Q.  And then toward the end of the photographs, there is a

16   backpack.  Do you recognize that backpack as the backpack that

17   you produced?

18   A.  I do.

19   Q.  Is that a true and accurate photograph?

20   A.  It is.

21   Q.  There is also some photograph of a receipt and mail.  Is

22   that something you produced to law enforcement?

23   A.  I don't think I -- I think it was just in a stack of

24   papers that had been -- I mean, it was in a stack of papers

25   that was in my truck that, I guess, they found in there.  I

1    did never look through them all.

2    Q.  Okay.  But did you see these things on the day in

3    question?

4    A.  I did.

5    Q.  Are these true and accurate to what you saw that same

6    day?

7    A.  It is.

8         MR. BLIZZARD:  Your Honor, I would propose to take

9    Government's Exhibit Number 2 and make it Defendant's Exhibit

10   1 and offer that into evidence at this time.

11        THE COURT:  Is there objection?

12        MR. LORFING:  No objection, Your Honor.

13        THE COURT:  Government's Exhibit 2, as yet

14   unadmitted, is now admitted as Defendant's Exhibit 1.

15        MR. BLIZZARD:  Thank you, Your Honor.

16   BY MR. BLIZZARD:

17   Q.  Ma'am, I wanted to point out, when I was talking to you

18   earlier about the improvements of the residence, the sidewalk

19   looking bricks out here?

20   A.  Yes.

21   Q.  That's what he installed.  That's in the first photograph?

22   A.  It is.

23   Q.  And these stairs at the back of the trailer, he installed

24   those?

25   A.  Yes, he did.

1   Q.  Then as we go into the trailer, the third photograph, do

2   you have that in front of you?

3   A.  Okay, yes.

4   Q.  This is where Mr. Regan was sleeping, correct?  When he

5   would stay there, he would sleep in this room?

6   A.  When he was there, I'm assuming he would either sleep

7   there or on the couch.

8   Q.  All right.  And these clothes in this closet, those are

9   his clothes?

10  A.  Yes.

11  Q.  These pillows and sheets, things like that, those are

12  things he slept in, if he slept in that bed?

13  A.  Yes.  If he slept there, yes.

14  Q.  And the dresser in question here is depicted in Picture 3

15  kind of underneath the TV, right?

16  A.  Yes.  That's a built-in dresser.

17  Q.  Picture 4 is a picture of a closet where we see a pillow

18  and this looks like a camera case.  Is that right?

19  A.  Yes.

20  Q.  There is a picture of what looks to be a security camera

21  on the next page, which is 5.  Do you see that?  Is that

22  right?

23  A.  Yes.

24  Q.  And there is additional medications and what appears to be

25  a bucket on Page 7 and 8 next to the camera?

92

1    A.  Yes, I see it.

2    Q.  Those are Chris's medications, right?

3    A.  Yes.

4    Q.  When you get to Page 11, this is the dresser drawer in

5    question, correct?

6    A.  Page 11?

7    Q.  Yes.  They are marked at the bottom if you haven't noticed

8    that?

9    A.  I'm sorry.  Do what?

10   Q.  They are marked at the bottom of the page, the little

11   numbers.  Do you see that?

12           THE COURT:  Bottom left.

13   A.  Okay.  There it is, yes.

14   BY MR. BLIZZARD:

15   Q.  And this is the sock and underwear drawer, right?

16   A.  It is.

17   Q.  And then opening up the drawer, Page 12, that is the disks

18   or SD cards, SIM cards, in question, right?

19   A.  Yes.

20   Q.  They weren't here like this, were they?

21   A.  What do you mean?

22   Q.  You had to move some things to see those, right?

23   A.  Yes.  They were stacked in the right-hand corner,

24   though.

25   Q.  So this blue cloth and these socks, and whatever all these

1    clothing and materials, were covered, right?

2    A.  Yes.

3            MR. BLIZZARD:  I'll pass the witness, Your Honor.

4            THE COURT:  Redirect?

5            MR. LORFING:  Thank you, Your Honor.

6                    **REDIRECT EXAMINATION**

7    BY MR. LORFING:

8    Q.  Ms. Wilkins, we have less than five minutes and you're

9    done.

10       There is talk about how Chris would refer to the trailer

11   as his house.  Can you explain that to the Court?

12   A.  Well, yes, because the house I live in and then that

13   house, if I had said -- I called it his house just like I

14   would call it anybody's house who was staying there.  It was

15   different from the one that I was living in and that one.

16   Q.  So you think it's just semantics.  It's not his house?

17   A.  No, it's mine.

18   Q.  And do you believe Chris thought or knew that it wasn't

19   his house?

20   A.  Yeah, he knew it wasn't.  He didn't ask for it to be.

21   Q.  Ma'am, the first time we met was two days ago.  Is that

22   right?

23   A.  It is.

24   Q.  We have spoken maybe five or ten times on the phone?

25   A.  Yes.

94

1    Q.  You have spoken to your son probably over a hundred times

2    in the last several months, correct?

3    A.  Yes.

4    Q.  You've talked about this case?

5    A.  I think in the beginning, I did.  I don't -- to be honest,

6    I really don't know.  There were so many phone calls.

7    Q.  Understood.

8        Ma'am, you had mentioned earlier you would often go into

9    the house and just sit on the couch and cry?

10   A.  Yes.

11   Q.  And you had mentioned that you would go into the house at

12   will when you wanted.  Is that right?

13   A.  Yes.

14   Q.  Did you believe you had the right of privacy in that

15   house?

16   A.  Meaning I had the right to go in there and do what I want.

17   Is that what you mean?

18   Q.  However you interpret the word "privacy"?

19   A.  Yeah.  That's my house.

20   Q.  There was a question earlier regarding a sock drawer,

21   underwear drawer, and you had testified a moment ago that you

22   had never -- you couldn't recall ever opening that drawer?

23   A.  No, I didn't.  I wasn't looking at his stuff.

24   Q.  You had previously done so when he asked you to, though,

25   right?

1    A.  Yes.

2    Q.  Is it true that you had testified earlier that you

3    believed that, if you wanted to, you could have came and

4    walked in there and opened up and pulled out some socks?

5    A.  Yeah.  He's my son.

6    Q.  Ma'am, earlier you tried to say something, and opposing

7    counsel said it was a "yes" or "no" question and answer

8    format.

9    A.  Yes.

10   Q.  What did you want to say?

11   A.  All these questions -- excuse me.  It's like you all are

12   talking about a stranger.  It's my son.  We didn't have that

13   kind of relationship.  He walked in my house.  He just walked

14   in and I walked in over where he was staying.  He walked in

15   and pulled out any drawer as I could with his.  We're not

16   talking about a stranger.  We're talking about my son.

17   Q.  I notice it's been difficult, and I appreciate your time,

18   ma'am.

19       The fact that he was your son, did that change your right

20   of access to that house?

21   A.  No.

22           MR. LORFING:  Thank you, ma'am.  No further

23   questions.

24           THE COURT:  You may step down.

25           MR. LORFING:  Your Honor, I'm very aware of the time.

96

1    With the Court's permission, I can put on a five minute

2    witness to end the government's case this morning, or if the

3    Court prefers, we can break for lunch.

4         THE COURT:  Are you going to present anything?

5         MR. BLIZZARD:  No witnesses, Your Honor.

6         THE COURT:  I'm going to go ahead and recess and

7    we'll pick it back up.  It will give me a chance to think

8    about what I have heard with my law clerk.

9         MR. LORFING:  Yes, Your Honor.

10        THE COURT:  It's 12:15.  Let's return here at 1:30.

11        (Hearing recesses, 12:10 - 1:30 p.m.)

12        BURTON REAVIS, testified under oath as follows:

13                    **DIRECT EXAMINATION**

14   BY MR. LORFING:

15   Q.  Agent Reavis, are you ready to proceed?

16   A.  Yes, sir.

17   Q.  Sir, can you please tell us how you're employed?

18   A.  I am a special agent with Homeland Security

19   Investigations.  I'm assigned to the Tyler resident agency.

20   Q.  And are you familiar with the facts surrounding the

21   investigation and the search involving this case?

22   A.  I am, sir.

23   Q.  Are you prepared to testify to the facts today?

24   A.  Yes, sir.

25   Q.  First, were you involved in the search at the trailer that

97

1  we've been discussing here today?

2  A.  Yes, sir.  I was involved in the search and in the

3  arrest.

4  Q.  In fact, you were present throughout that entire search.

5  Is that correct?

6  A.  Yes.

7  Q.  And preparing for this hearing today, did you interview

8  other witnesses?

9  A.  Yes, I did, sir.

10  Q.  Was I present in those interviews?

11  A.  Yes, sir, you were.

12  Q.  Did I ask some questions?

13  A.  Yes, sir, you did.

14  Q.  Were you present during the entirety of those

15  interviews?

16  A.  Yes, sir.

17  Q.  I want to talk to you about an interview we conducted with

18  Leta Peoples.  Can you tell the Court who Leta Peoples is?

19  A.  Leta Peoples is the mother-in-law of the defendant.

20  Q.  And did you speak to her specifically about the defendant,

21  Christopher Regan?

22  A.  Yes, I did.

23  Q.  Did you have a chance to ask Ms. Peoples during the months

24  of January and February 2019 where Christopher Regan would

25  typically eat?

98

1    A.  Yes, I did.  She indicated that he ate dinner at her house

2    frequently.

3    Q.  Did you have an opportunity to ask Ms. Peoples where

4    Christopher Regan would typically shower?

5    A.  She said that he took showers at her house, and if he was

6    taking showers somewhere else -- well, she did not know where

7    else he might be taking showers.

8    Q.  Did she indicate that he frequently would take showers at

9    her house?

10   A.  Yes.

11   Q.  Did you have a chance to ask her if Christopher Regan

12   would sleep frequently at her house?

13   A.  Yes, I did.

14   Q.  What did she tell you?

15   A.  She indicated that he did sleep at her house frequently.

16   She was unsure as to the exact frequency of how often he did

17   it because she stated that sometimes she would go to bed and

18   he was still there.

19   Q.  And so on those occasions where she would go to bed before

20   he did, she didn't want to testify whether or not he actually

21   spent the night that night?

22   A.  Correct.

23   Q.  But it was your understanding that on those nights that

24   she would go to bed and he would still be at the house?

25   A.  Yes.

1   Q.  During these months, it wasn't just Christopher Regan that

2   was sleeping there.  Is that correct?

3   A.  That's correct.

4   Q.  Would Leta Peoples and his wife, Tanya Regan, also be

5   there?

6   A.  Yes.

7   Q.  In addition to those questions, sir, I want to talk to you

8   about -- I think we referred to it as the critical response

9   time.

10      There was some testimony -- I believe you've been in the

11  Court this entire time?

12  A.  Yes.

13  Q.  Regarding the urgency of this search, can you speak to

14  that, sir?

15  A.  Yes, sir.  I have to disagree with my partner as to

16  whether or not there was exigency in this circumstance.  I

17  have investigated several child pornography cases, and the

18  fact that a family member is willing to turn over evidence is

19  no guarantee that by the time we actually get there, they

20  won't have changed their mind.  So as soon as I received the

21  phone call saying that Ms. Wilkins was prepared to turn over

22  evidence, I believed that we needed to get out there as

23  quickly as possible before she realized how much harm this

24  could do to her son and change her mind and possibly destroy

25  evidence.

1    Q.  Was there a general understanding that Ms. Wilkins had

2    informed you guys that Chris was asking her to destroy

3    evidence?

4    A.  Yes.

5    Q.  So knowing that there was a chance this evidence could be

6    destroyed, did that impact your decision on whether or not it

7    was urgent that you got there?

8    A.  Yes, sir.  I felt it was urgent for us to get there as

9    soon as possible.

10   Q.  Now, where were you at the time you received the call to

11   help?

12   A.  I was actually at a doctor's appointment.

13   Q.  And what did you do when you received that information?

14   A.  As soon as I received the information, I contacted the

15   nurse.  They know that I'm in law enforcement.  I told them

16   that I had a situation come up and I needed to be pushed to

17   the front of the line.  They complied and moved me to the

18   front of the line and got me out as quick as possible so that

19   I could arrive and assist Agent Noack.

20   Q.  Essentially, you were just getting a shot.  Is that

21   correct?

22   A.  Yes.

23   Q.  So you got the shot and you booked it?

24   A.  Yes.

25   Q.  You didn't say, we'll just do the search a couple days

101

1   from now?

2   A.  Absolutely not.

3   Q.  From the time you received the phone call to the time you

4   arrived at Ms. Wilkins's property, how much time had

5   elapsed?

6   A.  An hour and 15 minutes, possibly.

7   Q.  About how long was that driving time to get there?

8   A.  An hour.

9   Q.  So you would estimate that within about 15 minutes of

10  receiving the call, you were on your way to retrieving this

11  property?

12  A.  Give or take, yes, sir.

13  Q.  Did you believe that there was a risk that the property

14  could be destroyed?

15  A.  Yes.

16          MR. LORFING:  No further questions.  Thank you.

17          THE COURT:  Cross examination.

18          MR. BLIZZARD:  Thank you, Your Honor.

19                          **CROSS EXAMINATION**

20  BY MR. BLIZZARD:

21  Q.  Is it pronounced Reavis?

22  A.  It's pronounced Reavis.

23  Q.  How are you doing today, sir?

24  A.  Pretty good.

25  Q.  Agent Reavis, you said you were present for the arrest as

1   well, I believe.  Is that part your testimony, of Christopher

2   Regan?

3   A.  Yes.

4   Q.  Did you have occasion to participate in any of the

5   interview of Mr. Regan on what would be February 13?

6   A.  I did not participate in the interview.  Special Agent

7   Noack and a DPS investigator conducted that interview.

8   Q.  Did you review that interview?

9   A.  I did not, sir.

10  Q.  You never have?

11  A.  No, sir.

12  Q.  Have you discussed the contents of that interview with

13  your partner?

14  A.  I have in general terms, yes.

15  Q.  Was it relayed to you at the time that Mr. Regan reported

16  that the 124 address was his residence?

17  A.  Yes.  He identified that as his place of residence.

18  Q.  All right.  And you knew that before going out to this

19  scene, right?

20  A.  Yes.

21  Q.  Part of your testimony, I suppose, focuses on the idea

22  that this was what you're calling an exigent circumstance of

23  the interview?

24  A.  Yes.

25  Q.  How long have you been in law enforcement?

103

1    A.  Approximately 22 years.

2    Q.  And you know, don't you, that warrants can be obtained

3    relatively quickly?

4    A.  Yes, sir.

5    Q.  For example, people, state troopers in the state of Texas,

6    get blood draw warrants in a matter of minutes or an hour,

7    right?

8    A.  I believe that's correct.

9    Q.  So what prevented you from you and Agent Noack going to

10   the scene and securing it and then applying for a warrant?  Is

11   there something that prevented you from doing that?

12   A.  Once we reached the scene and secured consent, there was

13   no need for a warrant.

14   Q.  Right, but that's not my question.  My question is, was

15   there something that prevented you from just securing the

16   scene and getting a warrant?

17   A.  We saw no need to get a warrant after we got consent.  So

18   we didn't choose to pursue that offense.

19   Q.  I understand, but I really need you to answer that

20   question, though.  Was there anything that stood in the way of

21   you getting the scene secured and getting a warrant?

22   A.  I'm not sure I'm understanding your question.

23   Q.  I understand that you got consent.  Therefore, you don't

24   think you needed a warrant.  We're talking in the situation

25   of, had you decided to secure the scene and get a warrant

104

1    instead of getting consent, is that something you could have

2    done?

3    A.  Oh, if you're saying if that was a possibility, yes, we

4    could have presented it that way.

5    Q.  I apologize if that wasn't clear to you before.

6        You have this conversation with Ms. Peoples about the

7    extent of the time that she stayed over at her house, right?

8    A.  Yes, sir.

9    Q.  When did that conversation take place?

10   A.  That conversation took place in two parts.  Part of it was

11   this morning and part of it was Wednesday of this week.

12   Q.  Do you think that anything about what she told you would

13   be inconsistent with her believing that Mr. Regan also stayed

14   at 124 Private Road?  Is that confusing?

15   A.  I'm not for sure.

16   Q.  I'll rephrase it for you.

17       Is there anything that she told you in the interviews that

18   would lead you to believe that Chris Regan did not stay at 124

19   Private Road?

20   A.  Again, she told me that he frequently stayed at her house,

21   and she didn't know where he was the other times.

22   Q.  Okay.  But there was nothing said that she believed he

23   didn't say that?

24   A.  There was nothing precluding that, no.

25   Q.  You heard your, as you said, partner, Agent Noack's,

105

1    testimony earlier today, right?

2    A.  Yes, sir, I did.

3    Q.  And his recollection of the facts and discussion with

4    Ms. Wilkins when you all arrived on the scene?

5    A.  Yes, sir.

6    Q.  Do you have any different recollection than what he has

7    described?

8    A.  No, sir.

9    Q.  Any additional facts or different facts or, perhaps, you

10   didn't hear the same thing, anything that stands out to you?

11   A.  No, sir.

12   Q.  So you would concur with his testimony a hundred

13   percent?

14   A.  Yes, sir.

15   Q.  I'm just trying to confirm where you're at so we don't

16   have to go through it all again.

17        All right.  I'll pass the witness.

18             THE COURT:  Redirect?

19             MR. LORFING:  Yes, sir.

20                   **REDIRECT EXAMINATION**

21   BY MR. LORFING:

22   Q.  Agent Reavis, you were in the courtroom earlier when

23   opposing counsel asked your partner a question regarding

24   clothing of Christopher Regan.  I believe he had asked your

25   partner if it was a telltale sign of someone's residence if

1    they had clothes there?

2    A.  Yes, sir.

3    Q.  Did you ask Ms. Peoples if Christopher Regan also had

4    clothes at her place?

5    A.  Yes, I did.

6    Q.  And what did she tell you?

7    A.  She reported that he had several pairs of jeans, T-shirts,

8    at least one pair of shoes, socks and underwear.  Most of it

9    was piled in a laundry basket in the same bedroom that Tanya

10   Regan was occupying.

11           MR. LORFING:  No further questions.

12           THE COURT:  You may step down, sir.

13       The government may call its next witness.

14           MR. LORFING:  Your Honor, the government has no

15   further witnesses.

16           THE COURT:  Does the defense have anything?

17           MR. BLIZZARD:  Your Honor, we would briefly call Leta

18   Peoples.

19           THE COURT:  Good afternoon.

20           THE WITNESS:  Good afternoon.

21       (Witness sworn by the Court)

22           THE COURT:  You may be seated.

23       LETA PEOPLES, testified under oath as follows:

24                    **DIRECT EXAMINATION**

25   BY MR. BLIZZARD:

107

1    Q.  State your name, please.

2    A.  Leta Peoples.

3    Q.  All right.  Ms. Peoples, you've been in the courtroom

4    during the duration of today's testimony?

5    A.  Yes, sir.

6    Q.  Did you have an opportunity to speak with Mr. Pueschel

7    over here from my office regarding this case?

8    A.  Yes, at one time.

9    Q.  Okay.  And in your talk with Mr. Pueschel, did you confirm

10   to him that it was your belief that Christopher Regan resided

11   at least in part at 124 Private Road?

12   A.  Yes, he did.

13   Q.  And he also spent some time at your residence?

14   A.  Yes, he did.

15   Q.  If you had to put a number on it of how many days of the

16   week he would appear at your residence, how many days of the

17   week do you think it would be?

18   A.  It was several days that I -- you know, a few days that I

19   did invite him to come eat.

20          THE COURT:  Can you come closer to the microphone,

21   please?

22          THE WITNESS:  I'm sorry, sir.

23          THE COURT:  That's all right.

24   A.  There was a few days that I invited him over to eat, but

25   as far as staying the night, I'm not real sure, but it was

108

1    probably maybe three days.

2    BY MR. BLIZZARD:

3    Q.  Three days a week?

4    A.  Approximately.  I'm not real sure.

5    Q.  Okay.  And was part of the primary purpose of Mr. Regan

6    coming to your residence to do laundry and shower and things

7    of that nature?

8          MR. LORFING:  Objection, leading.

9          THE COURT:  I'll allow it.  You may answer.

10   A.  He asked me if he could, and I told him, yes.

11   BY MR. BLIZZARD:

12   Q.  Is that something that he did when he was over there?

13   A.  Not all the time.

14   Q.  And I believe another thing you told Mr. Pueschel was

15   that, when Mr. Regan would come over, Tanya would stay away

16   back in the bedroom.  Is that right?

17   A.  Yes.

18         MR. LORFING:  Objection, leading, Your Honor.

19         THE COURT:  Sustained.

20   BY MR. BLIZZARD:

21   Q.  Where would Tanya be when Mr. Regan would come over?

22   A.  She stayed mostly in her bedroom.

23   Q.  So did it appear to you that he was there to socialize and

24   live with her as husband and wife?

25   A.  No.

1   Q.  At that time were you aware of the legal status of their

2   marriage?

3   A.  Yes.

4   Q.  Were you aware of the petition that Mr. Regan had filed

5   for divorce against Tanya?

6   A.  Yes.

7   Q.  Was Tanya living with you?

8   A.  Yes.

9   Q.  Had she lived with you since she bonded out on the sexual

10  assault charge?

11  A.  After she bonded out, she stayed in a motel there for

12  awhile there in Big Spring.

13  Q.  Okay.

14  A.  And after a point it got too expensive, she asked me if

15  she could go to my house.  She went to my house, and I was

16  staying with the kids.

17  Q.  Did it appear to you that Chris and Tanya were separated

18  as far as not co-habitating?

19  A.  At that time, yes.

20          MR. BLIZZARD:  No further questions.

21          THE COURT:  Cross examination.

22                    **CROSS EXAMINATION**

23  BY MR. LORFING:

24  Q.  Ms. Peoples, we've met before, right?

25  A.  Yes, sir.

110

1    Q.  We've met on two occasions?

2    A.  Yes, sir.

3    Q.  You recall I asked you several questions about Mr. Regan

4    and where he resided just two days ago?

5    A.  Yes.

6    Q.  Do you remember telling me that Mr. Regan would frequently

7    stay at your house?

8    A.  Yes.

9    Q.  And you said it was most nights.  Do you recall that?

10   A.  Yes.

11   Q.  Do you recall saying that on the other nights that you

12   weren't sure about, it's because you went to bed before him.

13   So you couldn't tell me if he spent the night there or not?

14   A.  Yes.

15   Q.  Did you ever see Mr. Regan spend the night at Stephany's

16   house?

17   A.  One time he called me to come over.  He wanted to talk to

18   me, and I went over there.  It was dark, you know.  And I

19   talked to him and then I left and went back home, and he was

20   still there.

21   Q.  Other than this one occasion, can you recall any other

22   time that you had personal knowledge that he was staying at

23   Stephany Wilkins's house?

24   A.  No.

25   Q.  You're aware that your daughter has pled guilty to the

111

1    production of child pornography of your grandchildren?

2    A.  I wasn't sure of the charges, but, yes.

3    Q.  Did it strike you as strange that even though this came

4    out, that Chris Regan would go and spend the night with her

5    there?

6    A.  Well, when I would get up in the mornings, he would be on

7    the sofa or in the spare bedroom, not in her room.

8    Q.  My question is, did it strike you as strange that he would

9    be over with his wife after learning of what she did to her

10   children?

11   A.  I don't know how to answer that.  I don't know how to

12   answer it.

13   Q.  Well, you can answer truthfully.  Was it odd to you?

14          THE COURT:  What does that prove if it was odd or

15   not?

16          MR. LORFING:  Your Honor, essentially, it's

17   credibility.  At this point I think she's lying to the Court,

18   and I want to know if she's willing to -- it goes to her

19   veracity.

20          THE COURT:  I don't agree.  Move on.

21          MR. LORFING:  Yes, Your Honor.

22   BY MR. LORFING:

23   Q.  You had mentioned that it's your understanding that Tanya

24   and Chris Regan were not co-habitating at your place?

25   A.  No.

112

1    Q.  What does co-habitate mean to you?

2    A.  They were living together as husband and wife.

3    Q.  Okay.  If I were to say that maybe co-habitate means that

4    they're just living in the same place, different bedrooms,

5    different couches, would that change your opinion as far as

6    co-habitating?

7    A.  I guess so.

8    Q.  Okay.  So based on the way I'm defining co-habitate -- and

9    I'm going to define that as just the fact they're sleeping

10   under the same roof -- would you say that during the months of

11   January and February that Christopher Regan was co-habitating

12   with Tanya?

13   A.  Not all the time.

14   Q.  Okay.  And I just want to be clear for the Court.  You

15   told opposing counsel you thought it was about three times a

16   week.  You told me it was most nights.  You have agreed with

17   me it's most nights, but I want to give you a chance --

18   A.  That's approximate.  I'm not real sure.  I couldn't give

19   you an actual number of days or nights.

20          THE COURT:  You know, really, those two aren't

21   inconsistent.  Three to four, four being most of seven, most

22   nights would be four or more, right?

23          MR. LORFING:  Yes, Your Honor.  I'm sorry.  I

24   understood her testimony to be three times a week is what she

25   testified to.

113

1    THE COURT:  I understood three or four.  I could be

2    wrong.  Go ahead.

3    MR. LORFING:  I think you're right, Your Honor.  I

4    apologize.

5    BY MR. LORFING:

6    Q.  Where did Christopher Regan shower most nights to your

7    knowledge in January and February 2019?

8    A.  When he come over to my house, he usually took a shower

9    there.

10   Q.  Do you recall when I talked to you and Agent Reavis was

11   present, do you recall that a couple of days ago?

12   A.  Yes.

13   Q.  Do you recall telling me that he showered at your house

14   almost every night, but you're not sure where he showered any

15   other time?

16   A.  He frequently showered there, yes.

17   Q.  Remember, you said you knew why he showered at your house,

18   right?

19   A.  Yes.

20   Q.  In fact, you said it's because he didn't have hot water at

21   his place?

22   A.  Yes.

23   Q.  And you said, if he wasn't showering at your place, it had

24   to be at Stephany's house or somewhere else?

25   A.  I assume so.

1    Q.  You also said that most of the time he would eat at your

2    house, correct?

3    A.  When he was there.

4    Q.  Well, that's not what you told me.  Did he most nights in

5    January and February 2019 eat at your house?

6    A.  He frequently did, yes.

7    Q.  And the reason you told me was because he didn't have a

8    stove at his place?

9    A.  Yes.

10   Q.  So he would come over and he would eat with you?

11   A.  Yes.

12   Q.  He would eat with Tanya?

13   A.  Not all the time.

14   Q.  He would just eat by himself sometimes?

15   A.  Usually, he and I was at the dinner table, and Tanya took

16   hers to the bedroom and stayed in the bedroom.

17   Q.  Ma'am, is it your opinion that Christopher Regan was

18   staying at your place?

19          MR. BLIZZARD:  Objection as vague, staying at your

20   place.

21          MR. LORFING:  Thank you.

22       I'll rephrase, Your Honor.

23   BY MR. LORFING:

24   Q.  Isn't it your opinion that Christopher Regan was staying

25   at your house on a regular basis?

1    A.  Yes.

2    Q.  There was clothes of Chris's at your house?

3    A.  When he did laundry.  There is some there now that was

4    left.

5    Q.  Do you recall me going through it, and we counted how many

6    jeans he had?

7    A.  Yes.

8    Q.  He had one pair of jeans, two pair, three, five pairs of

9    jeans?

10   A.  Yes.

11   Q.  He had multiple shirts there, too, right?

12   A.  Yes.

13   Q.  Socks and underwear?

14   A.  Yes.

15   Q.  He had shirts?

16   A.  Yes.

17   Q.  Boxers?

18   A.  Yes.

19   Q.  As opposing counsel said, that's a telltale sign of

20   residence.  Would you agree that he had clothes there?

21   A.  Yes.

22          MR. LORFING:  No further questions, Your Honor.

23          MR. BLIZZARD:  Redirect, Your Honor?

24          THE COURT:  Go ahead.

25          MR. BLIZZARD:  Thank you.

1       **REDIRECT EXAMINATION**

2    BY MR. BLIZZARD:

3    Q.  Ms. Peoples, I want to convey to you something here

4    because I want to ask you a couple of candid questions, okay?

5        The only way you're going to get in trouble for anything

6    here is if you don't tell the truth, okay?

7    A.  Yes.

8    Q.  So I want you to consider these questions, just a couple.

9        In your meetings with government agents or attorneys, have

10   you felt pressure, either by them, by your own self, or any

11   other circumstance, to tell them what they wanted to hear?

12   A.  No.

13   Q.  Do you feel like the family in general of Chris Regan, his

14   mother, siblings, people related to him, any of those people,

15   have felt pressure to tell the government what they want them

16   to say?

17   A.  I don't know.

18   Q.  That hasn't been communicated to you by anybody?

19   A.  No.

20   Q.  Can you explain the inconsistent answers from today and

21   your meeting with Mr. Lorfing?  How do we have different

22   answers today?

23          THE COURT:  I think that's too vague.  You're going

24   to have to be more specific.

25          MR. BLIZZARD:  Yes, sir.

1   BY MR. BLIZZARD:

2   Q.   In your conversations with Mr. Pueschel, my office, and

3   Mr. Lorfing, there appears to be some pretty significant

4   differences.  Do you agree?

5           THE COURT:  That's still -- you have got to give a

6   witness enough to go on rather than say, you said something

7   one time that's different from what he said now.  Why?  How

8   would we know?

9           MR. BLIZZARD:  Yes.

10  BY MR. BLIZZARD:

11  Q.   You told Mr. Pueschel that Chris appeared to be at your

12  house primarily to do laundry, right?

13  A.   Do laundry, yes.

14  Q.   Okay.  That doesn't seem consistent with what you've said

15  here today.  Do you agree with that?

16  A.   I assume.

17  Q.   Okay.  So why are we having these inconsistencies?  What's

18  the deal?

19          THE COURT:  Now, you just said inconsistencies, and

20  you may be demonstrated one inconsistency.

21          MR. BLIZZARD:  All right.  Yes, sir.

22  BY MR. BLIZZARD:

23  Q.   Why do we have that inconsistency?

24  A.   I'm not understanding.

25  Q.   Well, why are you telling Mr. Pueschel one thing and

1    Mr. Lorfing another, this Court another?  Why do we have

2    different answers for how often Chris is at your house, for

3    how long, you know, these kinds of things?

4    A.  I can't put an actual number on how many times he was

5    there, but when he would come over and needed clothes washed,

6    he asked me if he could bring them and wash them.  I let him

7    do it.  There's times that I have called and asked him if he

8    wanted to eat dinner.  Sometimes he's there and I'm cooking

9    dinner.  Sometimes he stays the night.  Sometimes -- you know,

10   I can't put an actual number on it because I didn't sit and

11   count and put it on a calendar.

12   Q.  Fair enough.  It's varied because the answers are -- it's

13   hard to put a number on it.  Is that your answer,

14   essentially?

15   A.  Yes.

16          MR. BLIZZARD:  No further questions, Your Honor.

17          THE COURT:  Redirect?

18          MR. BLIZZARD:  No, Your Honor.

19          THE COURT:  You may step down.

20          THE WITNESS:  Thank you.

21          THE COURT:  Defense may call its next witness.

22          MR. BLIZZARD:  No other evidence or witnesses, Your

23   Honor.  We rest.

24          THE COURT:  Rest?

25          MR. LORFING:  The government rests, Your Honor.

1    THE COURT:  There was some mention earlier that we

2  might want to have some brief argument.  Do you still want to?

3    MS. HOWEY:  Yes, Your Honor.

4    MR. LORFING:  Please, Your Honor.

5    THE COURT:  All right.  I'll let the government go,

6  but do keep it grief.

7    MS. HOWEY:  Your Honor, there is no disagreement

8  between the parties as to whether in the absence of a warrant

9  an individual may consent to a search of his property and

10  premises and effects.  The question here today is whether the

11  consent given to search the trailer at 124 Private Road, 5503,

12  was valid.

13    The evidence we've heard today establishes that

14  Ms. Stephany Wilkins, who is the defendant's mother and who is

15  the owner of the trailer at that address, gave valid consent,

16  and she was able to do so because she exercised complete

17  ownership of and access to that trailer, and she did so to the

18  extent that he had actual and apparent authority to give that

19  consent.

20    Turning to actual authority, this determination is fact

21  intensive.  The focus is on the third party's actions as well

22  as the defendant's.  It is whether the defendant allowed the

23  third party the degree of access and control over the

24  property, here, Ms. Wilkins, that it can be said that he, the

25  defendant, relinquished an expectation of privacy of the

1   property, and by doing so, whether he assumed the risk that a

2   third party, his mother, might expose that risk to others,

3   including law enforcement.

4       Your Honor, after Ms. Wilkins allowed the defendant to

5   stay in her trailer, she continued to exercise unfettered

6   access to it, and the defendant never tried to impede access.

7   We see this from the fact that Ms. Wilkins entered the trailer

8   on a regular basis and without notice to the defendant and

9   without complaint from the defendant.

10      Ms. Wilkins told the defendant twice during jail calls

11  that she accessed the trailer.  She went into it and drank

12  tequila.  She very matter of factly testified that she

13  repeatedly entered the trailer when she deemed it necessary to

14  change the thermostat, turn off the AC, turn off floor

15  heaters, and she testified that her son knew that she did

16  this.

17      By her own testimony, we know that Ms. Wilkins entered the

18  trailer at her will and would never have imagined asking her

19  son whether she could do it.  Ms. Wilkins's access was not

20  limited to the times her son was not in the trailer.  She

21  testified that her son would not have objected had she barged

22  into the trailer without knocking.  She said that if he had

23  objected, they would have, quote, words, because it was her

24  trailer.

25      She testified to the broad degree of access she believed

1    she had.  She believed that she could have entered the trailer

2    to take milk from the refrigerator, take a pillow from the

3    bed, and even take socks from the defendant's sock drawer.  We

4    also know that Ms. Wilkins often went into the trailer for no

5    reason other than to cry.

6        What about Christopher Regan?  That's the other part of

7    the actual authority equation.

8        We know that the defendant did not attempt to ensure that

9    he had privacy at all in the trailer.  We heard no testimony

10   showing that he ever objected to his mother's access to the

11   trailer.

12       Significantly, he did not change the locks on the trailer

13   door, nor did he put a lock on his bedroom door.  In fact, he

14   knew his mother maintained the key to the trailer, and she

15   kept it on a key chain with keys to all of her other property.

16   She testified that she had the key chain for nine years, I

17   believe, since 2011.  Her son did not ask her to relinquish

18   the key when he moved in, and she continued to use it and

19   access the trailer at her leisure and with some frequency.

20       On the other hand, the defendant did change the locks on

21   the storage shed behind the trailer.  Ms. Wilkins had to ask

22   for a key to the storage shed.  In fact, we heard on a jail

23   call her asking where the key was.  He had to tell her where

24   to find it.  This strongly suggests, strongly demonstrates,

25   that the defendant took steps to protect the privacy he

122

1   believed he had in the shed, but he did not do so in regard to

2   the trailer.

3       Finally and significantly, when Ms. Wilkins told the

4   defendant that she feared -- excuse me, law enforcement might

5   search the trailer, he did not tell her to prevent that from

6   happening.  He did not tell her to refuse consent.  He did not

7   tell her to do anything to protect whatever interest he now

8   believes he had in that property.  He didn't do so because he

9   had no right to do so.

10      Finally, when the defendant's mother expressed fear that

11  Homeland Security Investigations might search the trailer, the

12  defendant implicitly acknowledged that his mother could

13  consent to the search.  He told her that law enforcement would

14  take things from the trailer, only if you allow it, Mom.  Only

15  if you allow it.  In other words, only if you consent.

16      She did allow it, and she could do so.  She could do so

17  because she would take access, control and use of the trailer,

18  and the defendant allowed it, and by doing so, he could not

19  now argue that he had an expectation of privacy in the

20  property.  He never had one and he did not have one on

21  March 1, 2019.

22      Defense counsel elicited testimony from Ms. Wilkins as to

23  whether her son wanted her to allow the search, and whether

24  when he asked her to remove the items from the trailer, he

25  wanted to limit that direction to her, in other words, whether

123

1    his direction to his mother was only an authorization for her

2    to remove the items.

3         Your Honor, it is immaterial whether the defendant would

4    have wanted Ms. Wilkins to allow it or to prevent it.  In

5    other words -- I should say to allow or prevent a search.  It

6    is immaterial whether he expected that his mother would limit

7    his instruction to her, whether she would remove the items

8    rather than asking law enforcement to do so.

9         What is relevant, what is important, is what Christopher

10   Regan did.  He allowed his mother unfettered access to the

11   trailer to such an extent that he assumed the risk that she

12   would allow others into that trailer, even law enforcement.

13        Finally, Your Honor, as briefed in the United States

14   response to the motion to suppress, the facts in this case are

15   similar to those in United States versus Shelton.  Although in

16   Shelton, items were removed from a residence by a third party

17   and then given to law enforcement, and here the third party

18   solicited the help of law enforcement.  The Courts in Shelton

19   characterized the third party's actions as a search.  The

20   Shelton analysis, therefore, applies in this case.

21        Turning to apparent authority, the United States believes

22   the Court need not reach this analysis --

23             THE COURT:  I'm sorry.  Turning to what?

24             MS. HOWEY:  The analysis for apparent authority, it

25   is the United States's position that the Court need not reach

124

1    this analysis because the evidence and testimony establishes

2    actual authority in this case.  Even so, Your Honor, apparent

3    authority also supports the consent Ms. Wilkins gave to the

4    search of the trailer.

5        Apparent authority is found when the facts were such that

6    the officers reasonably believed the third party, here

7    Ms. Wilkins, had authority to consent to a search.  The facts

8    in this case were sufficient such that the agents who searched

9    the trailer at Lot 124 could reasonably believe that

10   Ms. Wilkins had authority to consent to the search.

11       Ms. Wilkins told the officers that she owned the property

12   for 40 years.  She took the agents to the trailer and she

13   opened the door to the trailer with a key, a key that she had

14   on a key ring with all of her other keys.  She asked the

15   agents to remove child pornography from for what she

16   characterized as her trailer, her property.

17       In this case, Agent Noack and Agent Reavis testified that

18   they believed Ms. Wilkins had authority to consent to a search

19   of the trailer.  Agent Noack specifically testified that he

20   could have obtained a warrant but he believed Ms. Wilkins had

21   authority to consent.  His belief was reasonable.

22       Finally, Your Honor, in an abundance of caution, Homeland

23   Security Investigations obtained a search warrant for the

24   items that were seized and the contents of those items seized

25   from the trailer.

1        I want to back up, Your Honor.  I think I may have

2    misspoken.  HSI Investigations obtained a search warrant to

3    search the contents of the items that were seized from the

4    trailer, and the defendant has not objected to that search

5    warrant.

6        Your Honor, based on the evidence and the testimony we

7    have heard today, Ms. Wilkins had actual authority to consent

8    to the search of the trailer of Lot 124.  In addition, she had

9    apparent authority.  For all of these reasons, the United

10   States respectfully asks the Court to deny the motion to

11   suppress.

12        THE COURT:  Question for you.  We have not had any

13   discussions of the items found in the car, the pickup truck,

14   whatever it was, the backpack, I believe and other things.

15        MS. HOWEY:  Yes, Your Honor -- go ahead, I'm sorry.

16        THE COURT:  I was just going to ask, are the parties,

17   basically, abandoning argument on that?

18        MS. HOWEY:  Yes.  The United States believes the

19   argument is moot.  We do not intend to use any of that

20   evidence at trial.

21        THE COURT:  Okay.  Is that why you haven't brought up

22   the point?

23        MS. HOWEY:  Yes, sir.

24        MR. BLIZZARD:  Pretty much, Your HOnor.

25        THE COURT:  You knew that?

1      MR. BLIZZARD:  I don't believe there is any real

2  relevant evidence that they were going to use.  I didn't know

3  for sure, but --

4      THE COURT:  All right.  Then I'm denying the motion

5  to suppress as to the backpack and all the other items found

6  in the truck or vehicle.

7      MS. HOWEY:  Thank you, Your Honor.

8      THE COURT:  Response?

9      MR. BLIZZARD:  Yes, Your Honor.

10  Your Honor, I believe this case is much like the Rodriguez

11  case cited in our brief.  There was a person who previously

12  resided there and still had items in the apartment, maintained

13  the key, and allowed law enforcement to enter, but law

14  enforcement acted without determining the full scope of the

15  situation.  The person did not actually have authority because

16  she was a previous resident, and that's a similar situation

17  here.

18  Ms. Wilkins, essentially, is a previous resident by the

19  fact that she designated this trailer to be a place where

20  Chris Regan could live and have his children.  Whether she

21  intended that to be for the rest of his life or temporary, she

22  granted him that property right to live in that trailer.  It's

23  a property right that could not just be taken away once

24  conveyed.  Whether there was rent exchanged or not, she would

25  have had to have gone through the eviction process to remove

127

1    him.

2        So then the question becomes, had Mr. Regan abandoned all

3    of his privacy interest in that property, because I think it's

4    clear to the Court that law enforcement knew he purported to

5    live there.  She said he was allowed to stay there.  So law

6    enforcement was on notice that he resided there.  They were on

7    notice that Stephany did not reside there.

8        So then it's really a question of, had he abandoned his

9    privacy interest by conveying the instructions to his mother

10   or giving her permission or allowing her to come in from time

11   to time, and for that, Your Honor, our argument is that

12   Ms. Wilkins's testimony, I think, even in the very last

13   statements that she made to Mr. Lorfing, is that it's a

14   relational dynamic that doesn't stand in the way of them going

15   into each other's property, but it's not a property right

16   dynamic.

17       When it really comes down to it, Mr. Regan had the ability

18   to exclude her.  Whether he chose to do that or not is not

19   really relevant to the inquiry of giving up his privacy

20   interest.  He allowed her to go in, because it would be

21   similar to a person that, say, had aging parents that lived in

22   a garage apartment or pool house, and you go in.  You go check

23   on them and you go see how things are going, and you may just

24   walk right in the door.  But if that aging parent said, hey, I

25   don't want you to come in here.  I'm busy or I'm tired or I

128

1  have a headache, or whatever, that person has the right to

2  exclude them.

3      Additionally, it's our position, essentially, what

4  Mr. Regan did here is grant his mother a license.  She was a

5  licensee to the property.  She alone had permission to enter,

6  to check on things, to turn the lights on and off, to drink

7  his tequila, you know, things of this nature.  It doesn't mean

8  that he granted license for all people and all persons.  It

9  also doesn't grant her a right of co-tenancy.  It's a license

10  that he granted her to go into the property to caretake for it

11  as we often do.

12      We have relatives or family members who we will leave a

13  key with, and we'll say, hey, check on my place while I'm

14  gone.  Go feed the cat.  Go make sure, you know, my house

15  isn't flooding.  That doesn't mean that that person then can

16  come and say, okay, Mr. Policemen, come on in the property

17  with me and check everything that's going on here.

18      So that's, essentially, our argument on actual authority.

19  On apparent authority, our argument really revolves around the

20  officer's knowledge.  The officers knew that Chris resided

21  there at least some.  There has been a lot of testimony today

22  about what the extent of that residency was, and I think it's

23  kind of an irrelevant inquiry.

24      He maintained it at least as a part-time residence, and

25  however slight that may have been, the evidence is clear that

1   it was a part-time residence, and that entitled him to that

2   privacy right.  Law enforcement knew, and they were not in a

3   position of going into it blind where they come to Ms. Wilkins

4   and she says, this is my property, you know, go on in.  They

5   knew he had given that address as his residence.  They knew

6   that he at least resided there.  They knew he had things in

7   there, and so their reliance on her representation was

8   misguided.

9        I think that, additionally, just to address a few things

10  in the government's closing argument, they pointed out one

11  thing that I think is not exactly correct.  So I'll just point

12  it out to the Court, is that there is some difference between

13  the storage shed and the trailer because he, they said in

14  closing, changed the locks.  Well, he didn't change the locks.

15  He put a lock on it because he put stuff in it.  Just like the

16  trailer had a lock, the storage building needed a lock.

17       They make this argument to try to differentiate the

18  storage building from the house, but I think that's a

19  misguided argument because they are, essentially, stating that

20  it applies in one sense but not the other, because we heard in

21  a jail call Mr. Regan is telling her where the key is to go

22  unlock the storage building, once again, allowing her to have

23  license to that storage building.  So I think the argument

24  that they make for that works against itself.

25       I also believe that in the statements that the government

1    relies on in its analysis of the jail calls, the government

2    takes a hypertechnical, misleading interpretation.  I believe

3    it's very clear to someone listening to the jail calls that

4    Mr. Regan's intent was he did not want that house searched.

5    He was not happy about it.  He did not desire it.  He didn't

6    say it should happen.  His phrasing and his demeanor and his

7    mood were clear that he didn't want it searched, and it would

8    only happen if she literally physically let them in.  That

9    doesn't mean that he's acknowledging that she has the legal

10   capacity.  It's him acknowledging she has the physical power

11   to unlock the door.

12       So with all that, Your Honor, we believe that the

13   government's evidence should be suppressed, and we pray for

14   that ruling.

15       (Brief pause in proceedings)

16           THE COURT:  I make the following findings on the

17   record:

18       The dwelling at 124 PR, 5503, Point, Texas, was not the

19   defendant's sole residence.

20       Second, the defendant only kept about one percent of his

21   property there.

22       Number three, Stephany Wilkins had unfetterred and

23   frequent access to the premises.

24       Finding four, Stephany Wilkins was fully in control of the

25   residence and had full authority over it.

1       Finding five, the defendant did not ask or tell his

2   mother, Mrs. Wilkins, not to consent to a search of the

3   trailer at 124.

4       Finding Number six, defendant's mother, Mrs. Wilkins, the

5   owner of the premises, did not recognize that the defendant

6   had any right to exclude her from the premises or deny her

7   access to any part of it.  So when she was asked if she had

8   any right -- if he had any right to privacy there, she

9   answered correctly in the sense that, as to her, he had no

10  such right.

11      Finding Number 7, given the relationship between the

12  defendant and his mother and the interaction between them at

13  the premises, the defendant could not reasonably and

14  subjectively expect that he would have privacy while he was

15  present, much less while he was away.

16      My conclusions are that, if the defendant had an

17  expectation of privacy at 124 PR, 5503, he relinquished it.

18  That Stephany Wilkins gave valid consent to the search of the

19  residence at 124 PR, 5503.  That even if Stephany Wilkins did

20  not have actual authority to grant consent, she had apparent

21  authority for the reasons set out by the government on Pages 8

22  through 10 of its response to the motion to suppress.

23      Next, that the search did not violate the Fourth Amendment

24  to the United States Constitution, which requires that the

25  motion to suppress be denied.

1      A finding of common authority is based on facts showing

2   mutual use of property by persons having joint access or

3   control for most purposes so that it is reasonable to

4   recognize that, in this case, Ms. Wilkins had the right to

5   permit the inspection in her own right and that the others had

6   assumed the risk.  That other would be her son.

7      Assumption of risk is a critical inquiry.  It's fact

8   intensive, and the focus is not upon a third party but rather

9   on the defendant whether the defendant relinquished an

10   expectation of privacy.

11      As I said, I have some doubts whether he ever had an

12   expectation of privacy from the beginning, because

13   Ms. Wilkins's exercise of dominion and control over the

14   property was so complete, but even if he did have an

15   expectation, he did relinquish it.  The essential question

16   being whether he granted the third party a level of access and

17   control over the property that resulted in the loss of

18   expectation of privacy.

19      Again, that's stated oddly for this situation because it's

20   hard for me to conclude that he granted a level of control and

21   access when I'm not sure he ever even had a level of access

22   and control to grant to someone else, including his mother.

23      The facts in this case are similar to United States v.

24   Shelton.  In this case as in Shelton, the defendant knew his

25   mother accessed the trailer at will but took no steps to

1    restrict her access in any way.  He did not ask his mother to

2    remove anything that was hers in the premises.  He did not

3    change the lock.  He never objected to his mother entering the

4    trailer or allowing others, including her husband to enter it,

5    and as indicated by Ms. Wilkins in response to my question,

6    had he ever objected to her entering without permission, she

7    would have had words with him because she considered that to

8    be her trailer and that he was a mere guest with almost no

9    rights of privacy.

10        As is stated in Shelton, the defendant's decision to

11   forego an expectation of privacy requires a conclusion that he

12   assume the risk that his mother would expose his privacy

13   interests to others, and that's what she did.

14        That's the conclusion of the Court.  There will be a

15   written order to follow, a short written order to follow,

16   confirming it will be signed and entered this day.

17        Is there anything we need to take up before we leave the

18   courtroom in preparation for the trial that's forthcoming?

19            MR. LORFING:  No, Your Honor.

20            MR. BLIZZARD:  No, Your Honor.

21            THE COURT:  All right.  We'll be in recess until

22   further call.

23        (End of proceedings, 2:35 p.m.)

24

25                            -oOo-

134

1                           I N D E X

2   Witnesses:        Direct    Cross    Redirect    Recross   Voir Dire

3   Brian Noack          4                                              8
                        11        30        41

4   Stephany Wilkins    48        74        93

5   Burton Reavis       96       101       105

6   Leta Peoples       106       109       114

7

8                           -oOo-

9

10

11                       E X H I B I T S

12  Exhibit Number                      Offered        Admitted

13  Government's 1                        20              20

14  Government's 7                        29              29

15  Government's 11                       50              51

16  Government's 10                       52              52

17  Government's 4                        65              65

18  Government's 5                        66              66

19  Defendant's 1                         90              90

20

21                           -oOo-

22

23

24

25

U.S. DISTRICT COURT

135

CERTIFICATE

1

2         I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter, and
3    that the transcript was prepared by me and under my
supervision.

4

5    s/  Ana P. Warren                    May 12, 2020
Ana P. Warren, CSR #2302                    Date
6    U.S. District Court Reporter

7

8                           -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25